# EXHIBIT B

# REDACTED VERSION

**CONFIDENTIAL - FILED UNDER SEAL**

# EXHIBIT 1

**CONFIDENTIAL - FILED UNDER SEAL**

```
 1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 2                  BEVERLY HILLS, CALIFORNIA

 3                 THURSDAY, NOVEMBER 21, 2019

 4                        11:01 A.M.

 5                          -0o0-

 6                          ***

 7                     WILLIAM TAYLOR,

 8          having been duly administered an oath

 9            in accordance with CCP 2094, was

10            examined and testified as follows:

11                          ***

12                       EXAMINATION

13     BY MR. CLEGG:

14        Q.   Okay.  Mr. Taylor, good morning.  Thanks

15     for coming.  I know these aren't the most exciting

16     part of your job, depositions, but to start off I

17     would just like to do some background -- kind of

18     some background questions.

19            I'm assuming you've done this before?

20        A.   Yes.

21        Q.   Can you state your full name for the

22     record?

23        A.   William Frederick Taylor.
```

**CONFIDENTIAL - FILED UNDER SEAL**

```
24          Q.   Great.  Are you aware you're being deposed
25     in the case Modern Font Applications, LLC versus
                                                          1


       UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE
↑


 1     UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE
 2     Peak Restaurant Partners?
 3          A.   Yes.
 4          Q.   Dine Brands Global?
 5          A.   Yes.
 6          Q.   You ever been deposed before?
 7          A.   Yes.
 8          Q.   And then you're -- okay.  Good.
 9               So in your deposition, of course, I'm going
10     to be asking you questions.  You're going to be
11     answering them under oath.
12               Do you understand this?
13          A.   Yes.
14          Q.   In your -- there are a few -- as you know,
15     because you've done this before, first, the court
16     reporter is attempting to transcribe stuff, the
17     things that we say, and so it's important that we
18     don't talk over each other, that we don't interrupt
19     each other and that we wait and maybe if I don't --
20     if I take over, you let me know.
```

**CONFIDENTIAL - FILED UNDER SEAL**

```
21          If you talk over me, it is I can ask
22     questions.  You can answer the questions.  And that
23     we don't -- that we don't nod heads or say "uh-huh"
24     or things like that.  We need "yes," "no" or things
25     that are verbal.
                                                        2


       UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE



 1     UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE
 2          Also unlike typical conversations, the
 3     answers today is under oath and that subjects you to
 4     criminal charges of perjury if you falsely give
 5     misstatements or under oath.
 6          Do you understand this?
 7     A.   Yes.
 8     Q.   Also I'm entitled to get complete answers.
 9     That means -- for example, let's say this morning
10     you had orange juice, toast and coffee and I asked
11     you what did you have for breakfast.  If you just
12     say "orange juice," that would not be a complete
13     answer.  Also you don't have to tell me what you had
14     for lunch if I ask you:  "What did you have for
15     breakfast?"  That is not the question, but that is
16     just examples.
```

**CONFIDENTIAL - FILED UNDER SEAL**

```
17              Do you understand that?

18       A.   Yes.

19       Q.   All right.  You mentioned you've been

20  deposed before.  For the other times where you a

21  witness, was it as for your employer?

22       A.   Yes.

23            MR. BERNTSEN:  Quick appointment we

24  previously talked about formal objections.

25            MR. CLEGG:  E.
                                                    3
```

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

```
1   UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2            MR. BERNTSEN:  Is objection to form

3   sufficient enough to constitute can we agree that

4   object to form --

5            MR. CLEGG:  Yeah.

6            MR. BERNTSEN:  -- and not a waiver.

7            MR. CLEGG:  Let's do that.  If I have an

8   objection, it might be in some instances

9   specifically what you're objecting to.

10            MR. BERNTSEN:  Okay.  Just ready or not,

11  thank you.

12            MR. CLEGG:  Thank you for bringing that up.

13       Q.   So do you routinely act as a witness on
```

**CONFIDENTIAL - FILED UNDER SEAL**

14    behalf of your current employer?

15         MR. BERNTSEN:  Object to form.

16         THE WITNESS:  Occasionally when a matter

17    involves --

18    BY MR. CLEGG:

19    Q.    Okay.  About how many times have you been

20    deposed before?

21    A.    Maybe a dozen.

22    Q.    Okay.  Were those mostly for Dine Brands

23    Global?

24    A.    Yes, it could be other.

25    Q.    Or related entities?

                                                        4

           UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

⌃

1          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2    A.    Yeah.

3    Q.    Okay.  Were any of those times you were

4    deposed prior to today related to the issue of

5    venue?

6         MR. BERNTSEN:  Object to form.

7         THE WITNESS:  No.

8         MR. CLEGG:  And Matt, what was the

9    objection, to form?  What was the basis of the

**CONFIDENTIAL - FILED UNDER SEAL**

10    objection.

11        MR. BERNTSEN:  Compound.

12        MR. CLEGG:  Okay.

13    Q.    What is your current position with Dine

14    Brands?

15    A.    Executive director of risk management.

16    Q.    And how long have you worked at Dine

17    Brands?

18    A.    Just over six years.

19    Q.    And how long have you had the current

20    position you had?

21    A.    Just over six years.

22    Q.    Just over six years?

23    A.    Yeah.

24    Q.    And what are your responsibilities at Dine

25    Brands?

5

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2    A.    Responsible for the corporate

3    identification and assessment of risk.

4    Q.    Okay.

5    A.    With -- dealing with both the Dine Brands

6    IHOP and Applebee's.

**CONFIDENTIAL - FILED UNDER SEAL**

```
 7        Q.   Okay.  And did you attend law school?

 8        A.   I did.

 9        Q.   And did you get a law degree?

10        A.   I have a law degree.

11        Q.   Are you an attorney?

12        A.   Oh, no.  I don't practice.

13        Q.   Okay.  Do any of your responsibilities

14   include buying, selling or leasing property for the

15   company?

16        A.   Only as it relates to insurance.

17        Q.   Okay.  Have you ever been involved with

18   buying selling or leasing property in Utah as part

19   of your work for Dine Brands?

20        A.   No.

21        Q.   Had you ever worked for any of the

22   subsidiaries of Dine Brands?

23        A.   No.

24        Q.   Does any of your work at Dine Brands

25   involve doing services for the subsidiaries?
```
                                                    6

            UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

```
 1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 2             MR. BERNTSEN:  Objection.
```

**CONFIDENTIAL - FILED UNDER SEAL**

3                    THE WITNESS:  Yes, oh, sorry.

4              MR. CLEGG:  What's the objection, Matt?

5              MR. BERNTSEN:  Vague for doing services for

6         the subsidiaries.

7              MR. CLEGG:  Okay.

8         Q.   Have you -- do you regularly interact with

9    any of the franchisees for Dine Brands?

10        A.   Not regular.

11        Q.   But you have interacted with them on

12   occasion?

13        A.   On occasion.

14        Q.   And what's the nature of that involvement

15   for -- what is the nature of your interaction with

16   the franchisees?

█   ██    ████████████████████████████████

█    ████████████████████████████████████

█    ████████████████    █████████████████████

█    ███████████████████████████

21        Q.   Okay.  How did you educate yourself about

22   Dine Brands' property including the subsidiary

23   properties in Utah for the purposes of this

24   deposition?

25        A.   I reviewed the documents that were provided

                                                    7

CONFIDENTIAL - FILED UNDER SEAL

```
 1      UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 2   by counsel.

 3        Q.   Okay.  What documents did you review?

 4        A.   I believe it was the motion.

 5             MR. BERNTSEN:  Objection; that's -- that's

 6   a document brought up by counsel.  It's getting into

 7   work product.  I'll instruct you not to answer.

 8             MR. CLEGG:  Except for that if it's a

 9   document you reviewed, whether you gave him the

10   document or not, and disclosed it to prepare, that's

11   pretty standard.

12        Q.   So if you reviewed documents to prepare for

13   this, we need to identify the documents you looked

14   at unless the document itself was specifically

15   prepared for -- for you by counsel that's a work

16   product document.  Then it's another document you

17   identified documents, we need that.

18        A.   Yeah.  The only documents I reviewed were

19   the motions denying venue, your motion -- that --

20   that would about it, my declaration.

21        Q.   Okay.  Other than counsel, did you speak

22   with anybody else to help prepare you for the

23   deposition?

24        A.   No.
```

**CONFIDENTIAL - FILED UNDER SEAL**

25          Q.

8

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1       UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2              MR. CLEGG:  I'm going to ask you for a copy

3       of a notice of deposition that we did.

4              THE WITNESS:  Okay.

5              MR. CLEGG:  And I'll give a copy to the

6       reporter.

7              And here's a copy for you, and I assume the

8       reporter will mark this as Exhibit 1 and you'll be

9       able to get that copy.

10             (Exhibit 1 was marked for ^ 1

11             identification by the reporter.)

12             MR. BERNTSEN:  And am I correct, Counsel,

13      this is not precisely the document that was served

14      in that it has some highlighting.

15             MR. CLEGG:  Yeah.  The only difference is

16      we have some highlighting.  That's correct.  They

17      weren't produced with highlighting, but they are

18      now.

19        Q.   Did you produce this before coming here

20      today?

**CONFIDENTIAL - FILED UNDER SEAL**

```
21        A.   Yes.

22        Q.   And did you try your best to educate

23   yourself on the topics?

24        A.   Yeah, through the counsel, through

25   documents provided.
```
                                                                9


                 UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE
&

```
 1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 2        Q.   Okay.

 3             MR. CLEGG:  Okay.  I'm going to -- if you

 4   would mark this as Exhibit 2.

 5             (Exhibit 1 was marked for ^ 2

 6              identification by the reporter.)

 7   BY MR. CLEGG:

 8        Q.   I assume you've seen this before, Exhibit

 9   No. 2?

10        A.   Yes.

11        Q.   And this would be your declaration?

12        A.   That's correct.

13        Q.   And did you prepare this?

14        A.   With counsel.

15        Q.   So you didn't write this?

16        A.   No.

17             MR. BERNTSEN:  Objection; form.
```

**CONFIDENTIAL - FILED UNDER SEAL**

18    BY MR. CLEGG:

19        Q.    Is that your signature at the end of it?

20        A.    That is.

21        Q.    And can you confirm that all the statements

22    made in here are accurate?

23        A.    Yes, I can.

24        Q.    Okay.  Paragraph 5 of your declaration it

25    mentions that the employees that work at IHOP

                                                    10

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1      UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2    restaurants in Utah are not employees of Dine

3    Brands.  Are there any employees that Dine Brands

4    has in Utah that are not IHOP employees?

5        A.    No.

6              MR. BERNTSEN:  Just remind you to please

7    give me a moment to lodge an objection if necessary.

8              THE WITNESS:  Thank you.

9    BY MR. CLEGG:

10        Q.    Does the -- does any of Dine Brands'

11    subsidiaries have employees residing in Utah?

12        A.    Not located in Utah.

13        Q.    They're -- they have employees that work on

**CONFIDENTIAL - FILED UNDER SEAL**

14    operations in Utah?

15            MR. BERNTSEN:  Object to form.

16            THE WITNESS:  They'll be IHOP employees

17    that will occasionally go to a restaurant in -- in

18    Utah.

19    BY MR. CLEGG:

20        Q.    When you say "IHOP employees," are you

21    referring to which IHOP entity?

22        A.    It will be IHOP underneath Dine Brands.

23        Q.    IHOP international or --

24        A.    I don't know the exact subsidiary that is

25    called.

                                                        11

        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

↑

1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2        Q.    Okay.  About how many employees do you have

3    that live in Utah?

4            MR. BERNTSEN:  Objection; form.

5    BY MR. CLEGG:

6        Q.    I'm referring to the IHOP entity that you

7    were referring to.

8        A.    Maybe 1 or 2.

9        Q.    Okay.  Does Dine Brands have any employees

10    that are assigned to the IHOP or the Applebee's

**CONFIDENTIAL - FILED UNDER SEAL**

11    franchise business that is in Utah?

12        A.    When you say "assigned"?

13        Q.    That their responsibilities to work on

14    business matters that arise out of Utah?

15        A.    They don't really work on business matters.

16    They just generally will go to a restaurant in Utah

17    and make sure that they're withholding -- they're

18    holding up the standards of the business.

19        Q.    Then --

20        A.    The franchisees, that is.

21        Q.    Are those employees of Dine Brands or

22    employees of the subsidiary?

23        A.    Employee of the subsidiary IHOP.

24        Q.    Are there any employees of Dine Brands?

25        A.    Not that I know.

                                                      12

            UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1            UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2        Q.    Are these employees that do monitoring of

3    the franchises?

4        A.    Field operations people.

5        Q.    Field operations?

6        A.    Yeah.

**CONFIDENTIAL - FILED UNDER SEAL**

7        Q.    And you're had -- okay.  And you don't know

8    which IHOP entity they work for.  What Applebee's --

9    do any of them work for Applebee's?

10        A.    Not -- not the IHOP individuals.  That is a

11   separate brand.

12        Q.    Sure.  But you have employees that -- do

13   you have employees that at Dine Brands that visit

14   Utah for the Applebee's franchise?

15        A.    I'm not aware of any Dine Brands employees

16   that visit Utah.

17        Q.    Are there any Applebee's related

18   subsidiaries?

19        A.    Do --

20        Q.    Employees that come to Utah?

21        A.    There could be.

22        Q.    But you're not familiar with them?

23        A.    No.  No.

24        Q.    But they would monitor them?

25        A.    Their role.

                                                      13


          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE



1         UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2         Q.    Wait a minute and would be Applebee's

3    restaurants or Applebee's related subsidiaries that

**CONFIDENTIAL - FILED UNDER SEAL**

4      have employees that come to Utah that monitor

5      Applebee's franchises, would that be correct?

6           A.    The same as with IHOP.

7           Q.    Okay.  So something true for IHOP it would

8      be true for Applebee's as well?

9                MR. BERNTSEN:  Objection.

10               THE WITNESS:  For the -- for the most part,

11     yes.

12     BY MR. CLEGG:

13          Q.    Okay.  So paragraph 6 of your declaration

14     you state that Dine Brands does not make directly --

15     does not make directly market directly offer for

16     sale or directly sell any goods or services in Utah.

17     Are you aware that food can be ordered in Utah

18     through IHOP.com?

19          A.    Well, I believe we have a delivery system

20     throughout the U.S.

21          Q.    Okay.  And who owns that delivery system is

22     that owned by a subsidiary or is that owned by Dine

23     Brands?

24          A.    I can't tell you.  Probably owned by IHOP.

25          Q.    Okay.  Are you aware that food can be order

                                              14


              UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

**CONFIDENTIAL - FILED UNDER SEAL**

```
 1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE
 2    in the Utah through applebees.com?
 3        A.   I'm not aware, but I suspect it can.
 4        Q.   Okay.  Did you take either of these
 5    Websites into account when making statements --
 6    making the statement in paragraph 6?
 7        A.   No.
 8        Q.   Were you aware that each Website has a
 9    prominent order online option?
10        A.   Well, in a general sense because I've
11    worked with IT and --
12        Q.   Uh-huh.
13        A.    -- and others and they you know
14    implementation from the interest risk standpoint.
15        Q.   Okay.  When somebody orders food online,
16    say through ihop.com and it directs to one of the
17    local franchisees and that food's delivered to them,
18    does the -- who collects the money that goes through
19    that order?
20        A.   I assume the franchisee.
21        Q.   But you don't know?
22        A.   Well, that's -- their position is to sell
23    food and sell the delivery service, so I would
24    assume the franchisee is the one collecting the
```

**CONFIDENTIAL - FILED UNDER SEAL**

25        money.
                                                                        15


                UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE



1               UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2          Q.    I guess the reason I ask is because if

3     ihop.com is operated by Dine Brands but you're not

4     sure with who the -- who owns the system?

5          A.    I don't -- I don't know if Dine Brands owns

6     the system.  I don't believe so.  I think it's brand

7     specific.

8          Q.    Meaning one of the IHOP subsidiaries?

9          A.    It could be, yeah.

10         Q.    But you don't know?

11         A.    No.

12         Q.    Okay.  So you don't know whether the

13    company pays the franchisee when ordering or where

14    the order goes when you order online?

15         A.    No, I wouldn't know.

16         Q.    So you don't know how the money flows when

17    orders are placed on either the ihop.com or the

18    applebees.com Websites?

19         A.    No, I wouldn't.

20         Q.    In your declaration paragraph 11, you said

21    that Dine Brands owns property in Utah.  What --

**CONFIDENTIAL - FILED UNDER SEAL**

22    what kind of property does Dine own in Utah?

23         A.   Well, through its subsidiary IHOP, it owns

24    properties.  It owns couple of buildings and we

25    hold -- but we sublease everything out.  Some ground

                                                      16

          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

↑

 1         UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 2    leases.

 3         Q.   Okay.  So does Dine Brands -- it says here

 4    it doesn't say anything about indirectly or directly

 5    it just says it owns property does Dine Brands own

 6    any property?

 7         A.   No subsidiary -- indirectly through its

 8    subsidiary it does.

 9         Q.   Okay.  Do you know the name of that

10    subsidiary?  Is there more than one?

11         A.   There's a variety of sub -- depending on

12    when the subsidiary was structured we IHOP

13    properties had IHOP Realty.

14         Q.   Could you identify those?

15         A.   I just did.

16         Q.   Okay.  So --

17         A.   There may be others.  You have to

**CONFIDENTIAL - FILED UNDER SEAL**

18      understand that these leases are -- can be extremely

19      old.

20              Q.   So IHOP Realty?

21              A.   Yeah.

22              Q.   IHOP what was the other one?

23              A.   Properties.

24              Q.   Properties?

25              A.   LLC those are the two I reasonable cause

                                                            17

            UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1           UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2       identify.

3               Q.   What about IHOP Leasing?

4               A.   Potentially.

5               Q.   Are these all wholly owned subsidiaries of

6       Dine Brands?

7               A.   Yes, well, let me back up.  It may be

8       subsidiaries of IHOP, LLC.

9               Q.   Okay.

10              A.   Because we have a structure Dine Brands,

11      IHOP and underneath we have subsidiaries of

12      subsidiaries.

13              Q.   Do you know who the managing of these

14      companies are?  Are they typically put in as

**CONFIDENTIAL - FILED UNDER SEAL**

15    management or are they just controlled by the

16    parent?

17              MR. BERNTSEN:  Object to form.

18              THE WITNESS:  Just controlled by IHOP.

19    BY MR. CLEGG:

20        Q.   Okay.  And how is -- you're talking about

21    IHOP international or?

22        A.   I don't believe there's an IHOP

23    international I could be wrong.

24        Q.   Okay.  And you're talking about IHOP that's

25    a subsidiary of Dine Brands?

                                                        18

          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

✦

1         UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2         A.   Right.

3         Q.   And IHOP is controlled by Dine Brands?

4         A.   It is a subsidiary of Dine Brands yes, a

5     hundred percent.

6         Q.   So it's controlled by Dine Brands?

7         A.   If you want to call it control.

8         Q.   Okay.  It takes direction from Dine Brands?

9         A.   It depends on exactly what we're talking

10    about.  Because Dine Brands runs an organization

**CONFIDENTIAL - FILED UNDER SEAL**

11    many subsidiaries.

12          Q.   Okay.

13          A.   IHOP makes the decisions.

14          Q.   Can Dine Brands veto any of those

15    decisions?

16          MR. BERNTSEN:  Object to form.

17          THE WITNESS:  It really depends on type of

18    objection veto with we're talking about if it's a

19    food safety issue.

20    BY MR. CLEGG:

21          Q.   Uh-huh.

22          A.   I assume that they could if it was a --

23    putting the new company in jeopardy, yes.

24          Q.   They can --

25          A.   But in general sense the brand runs the

                                                        19


          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE



1          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2    brand.

3          Q.   Uh-huh.

4          A.   So --

5          Q.   Do you know where the properties are

6    located the real property that we're talking about?

7          A.   I don't know where in Utah they're located.

**CONFIDENTIAL - FILED UNDER SEAL**

8        Q.    Do you know how many there are?

9        A.    For Dine or for IHOP or for Applebee's?

10       Q.    Well, why don't we start with -- well, for

11  Dine I thought you said the Dine properties were

12  held by subsidiaries?

13       A.    They are.

14       Q.    Okay.  So how many of those -- are there

15  separate -- well, let me back up.  Are there

16  separate properties that Dine uses that are

17  different than properties used, say, for

18  subsidiaries?

19       A.    No.

20       Q.    For IHOP?

21            MR. BERNTSEN:  Object to form.

22  BY MR. CLEGG:

23       Q.    So the properties would be properties used

24  by subsidiaries for IHOP franchises?

25       A.    Correct.

                                                    20

            UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1            UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2        Q.    And so the properties are owned by IHOP or

3   Dine Brands subsidiaries and then those properties

**CONFIDENTIAL - FILED UNDER SEAL**

4      are leased to the franchisees?

5          A.   I -- IHOP Realty for example.

6          Q.   Okay?

7          A.   Would be the one leasing the property to

8      the franchisee.

9          Q.   I see?

10         A.   And that subsidiary is under the IHOP, LLC

11     structure.

12         Q.   Okay.  Is the same true for Applebee's?

13         A.   In general, yes.

14         Q.   And do you know of the subsidiaries that

15     run the properties for Applebee's?

16             MR. BERNTSEN:  Object to form.  Do you mean

17     specifically in Utah?

18             MR. CLEGG:  In Utah.

19             THE WITNESS:  I wouldn't know specifically

20     in Utah which ones.

21     BY MR. CLEGG:

22         Q.   Are you -- are you aware of Applebee's

23     franchisor -- Applebee's Franchisor, LLC?

24         A.   I'm familiar with it.  I've seen the name

25     used in documents and such.

                                                          21

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

**CONFIDENTIAL - FILED UNDER SEAL**

```
1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2        Q.   Does that company own property in Utah?

3        A.   That I can't say.
```



CONFIDENTIAL - FILED UNDER SEAL

22

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

██ ████████████████████████

██   ███   ████████████

██   ███   ████████████   ██████████████

██   █████████████████████████   Does Dine Brands

6    own any equipment in Utah?

7        A.    Not that I'm aware of.

8        Q.    Does Dine Brands own a systems that are

9    used by the franchisees?

10            MR. BERNTSEN:  Object to form.

11            THE WITNESS:  No.  The systems that they

12   use are owned by a third party or owned by the

13   franchisee, but they utilize a vendor for that,

14   Micros.

15   BY MR. CLEGG:

16       Q.    Okay.  Do the subsidiaries have any

17   equipment?  Let me clarify.  Do any of Dine Brands

18   subsidiaries own equipment that's in Utah?

19       A.    No, not that I'm aware of.

20       Q.    Does Dine Brands maintain any asset in

21   Utah?

**CONFIDENTIAL - FILED UNDER SEAL**

22      A.    Not that I'm aware of.

23      Q.    So it's your testimony that the only

24  properties and asset in Utah that Dine Brands owns

25  indirectly through subsidiaries?

                                                    23

            UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

↟

1       UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2       A.    Correct.

3       Q.    And those subsidiaries would be the IHOP

4   subsidiaries?

5       A.    That's correct IHOP Realty IHOP properties

6   IHOP Leasing.

7       Q.    But there are business operations by

8   subsidiaries of Dine Brands in Utah?

9           MR. BERNTSEN:  Object to form.

10          THE WITNESS:  They're -- could you repeat

11  the question?

12  BY MR. CLEGG:

13      Q.    Dine Brands has subsidiaries that are

14  engaged in business operation in Utah?

15          MR. BERNTSEN:  Object to form.

16      A.    Business operations I mean they lease the

17  property to the franchisee which is done out of

18  California.

**CONFIDENTIAL - FILED UNDER SEAL**

19    BY MR. CLEGG:

20        Q.    And what about the Applebee's franchisees

21    or I should say what about Applebee's restaurant and

22    Applebee's Franchisor what business dealings or what

23    business operations do they have in Utah?

24            MR. BERNTSEN:  Object to form.

25            THE WITNESS:  Again, it would be just

                                                    24


        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE



1       UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2    monitoring for brand standards.

3    BY MR. CLEGG:

4        Q.    So they send somebody in occasionally to

5    look at the franchisees?

6        A.    They would.

7        Q.    Are there out types of franchise monitoring

8    that they do?

9        A.    Not that I'm aware of.

10        Q.    Franchiser free?

11            MR. CLEGG:  I'm going to hand you a copy of

12    the 2018 annual report for Dine Brands could you

13    mark this as Exhibit 3.

14            MR. BERNTSEN:  Given the courts order can

**CONFIDENTIAL - FILED UNDER SEAL**

```
15        you give me a cents of what topics it will be.
16              MR. CLEGG:  The only topics we'll address
17        in here are the ones approved by the Court so you're
18        not attempting to authenticate this.  This I will
19        represent to you that this is the 2018 annual report
20        of Dine Brands that we were able to get from
21        publicly available sources I believe from Dine
22        Brands Website.
23              THE WITNESS:  Okay.  Thank you.
24        BY MR. CLEGG:
25            Q.   ?
```
                                                                    25


            UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

↑


            UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

```
 1            UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE
 2              MR. BERNTSEN:  Counsel about that
 3        representation this document also appears to have
 4        highlighting.
 5              MR. CLEGG:  Yeah.
 6              MR. BERNTSEN:  Is that different than
 7        Website.
 8              MR. CLEGG:  Yeah so the highlighting is our
 9        highlighting that will make it easier for you to see
10        stuff it will make it quicker.
11              THE WITNESS:  Okay.
```

**CONFIDENTIAL - FILED UNDER SEAL**

12          MR. BERNTSEN:  Are there any other changes

13      in the document?

14          MR. CLEGG:  No.  Subscription agreement.

15      BY MR. CLEGG:

16          Q.    Before we get to this I want to ask you one

17      other question.  Does Dine Brands maintain any

18      storage space in Utah?

19          A.    Not that I'm aware of.

20          Q.    Does any of its subscription agreement

21      maintain any storage space?

22          A.    I he wouldn't know that I wouldn't think

23      so.

24          Q.    When you say not that you're aware of?

25          A.    Right.

                                                    26


                UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE



1       UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2           Q.    You couched a lot of your questions with

3       this phrase not that I'm aware of.  Is that because

4       you don't know or is that because it's just not the

5       case?

6           A.    Well, in the risk management role, I would

7       know whether there's properties -- where properties

**CONFIDENTIAL - FILED UNDER SEAL**

8      located that belonged and insurable interest in Dine

9      Brands or at Applebee's.

10          Q.   Okay?

11          A.   And I'm not aware of any properties that

12     been listed.

13          Q.   Okay.

14          A.   That we interests.

15          Q.   Okay.

16          A.   That's how I made that connection.

17          Q.   Okay.  Thank you.  If you look at page 10

18     of the annual report under "Information

19     Technology" --

20          A.   Uh-huh.

21          Q.   -- it says, "We use in-house developed and

22     third-party point-of-sale systems, kitchen data

23     systems, and back-of-the-house systems for

24     accounting, labor and inventory management in our

25     franchisees' restaurants."

                                                        27


                UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

↑


1           UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2               So according to this, it says that Dine

3      Brands, I'm assuming, has in-house developed

4      systems; is that correct?

**CONFIDENTIAL - FILED UNDER SEAL**

```
5                    MR. BERNTSEN:  Object to form.

6                    THE WITNESS:  The only in-house technology

7         that we have are with Applebee's.

8         BY MR. CLEGG:

9              Q.    Okay.

10             A.    That I'm aware of.

11             Q.    What kind of system is that?

12             A.    It's a POS system.

13             Q.    Does that system require equipment to

14        operate such as computer systems or registers?

15             A.    Well, we don't own that equipment.  That's

16        probably -- that belongs to the franchisee.

17             Q.    But you own the point-of-sale system?

18             A.    The technology, yes.

19                   MR. BERNTSEN:  Object to form.

20                   THE WITNESS:  Sorry.

21        BY MR. CLEGG:

22             Q.    Is there software as part of that

23        point-of-sale system?

24             A.    I would think so, yes.

25             Q.    And you own that software?
```

28

**CONFIDENTIAL - FILED UNDER SEAL**

1       UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2          A.    Yes.

3          Q.    And is that owned by Dine Brands?

4          A.    No.

5          Q.    Is that owned by one of the Applebee's

6    subsidiaries?

7          A.    It could be, yes.

8          Q.    Do you know which one?

9          A.    No.

10          Q.    With respect to the third party systems are

11    any of those licensed through Dine Brands?

12          MR. BERNTSEN:  Object to form.

13          THE WITNESS:  I couldn't say exactly what

14    subsidiary.  I would think it would be IHOP and

15    Applebee's be the -- but I wouldn't know if Dine

16    Brands signs agreements.  I doubt it.

17    BY MR. CLEGG:

18          Q.    But you don't know?

19          A.    I don't know.

20          Q.    So respect to point-of-sale, kitchen data

21    system and back-of-the-house systems for accounting,

22    labor and inventory management, you don't know who

23    owns those systems?

24          MR. BERNTSEN:  Object to form.

25          THE WITNESS:  Any system within the

29

**CONFIDENTIAL - FILED UNDER SEAL**

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

```
 1      UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE
 2      restaurant's four walls are owned by the
 3      franchisees.
 4      BY MR. CLEGG:
 5          Q.   Other than the point-of-sale systems?
 6          A.   The point-of-sale would be our technology,
 7      but the mechanism in which it is transferred or POS
 8      receives would be done on hardware owned by the
 9      franchisee.
10          Q.   But aren't some of those systems licensed
11      from third parties that are not franchisees?
12          A.   Yes.
13          Q.   And those licenses are with subsidiaries --
14          A.   I can't say.
15          Q.   -- of Dine Brands?
16          A.   I can't tell.  I answered that before.  I
17      don't know.
18          Q.   What you're saying is you don't know?
19          A.   Yeah.
20          Q.   And the hardware is owned by the
21      franchisees?
22          A.   Yeah, anything within the restaurant.
```

**CONFIDENTIAL - FILED UNDER SEAL**

23   Q. Were you able to identify each of the

24  leases of property in Utah by Dine or its

25  subsidiaries?

               30

    UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1   UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2     MR. BERNTSEN:  Object to form.

3     THE WITNESS:  No.  I -- I haven't memorized

4  it.  We have over 1,700 IHOP restaurants.

5  BY MR. CLEGG:

6   Q. In Utah?

7   A. No.  Throughout the nation.

8   Q. Right.  I'm referring specifically to Utah

9  I apologize?

10   A. No, I don't know specifically.

11   Q. Are there any leases that Dine or its

12  subsidiaries have in Utah that are not specifically

13  to the restaurants?

14   A. No.

15   Q. What comes in through leases of property in

16  Utah does that go directly to the subsidiaries?

17     MR. BERNTSEN:  Object to form.

18     THE WITNESS:  I believe it's actually --

**CONFIDENTIAL - FILED UNDER SEAL**

19    yes.  The name under the lease would be the recip --

20    recipient of the rent or whatever might be charges.

21    BY MR. CLEGG:

22        Q.   Does any of that money flow back to Dine

23    Brands?

24        A.   Well, if you look at the annual report, it

25    flows up through to IHOP, LLC and then, of course,

31

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2    the party company Dine Brands.

3        Q.   So indirectly --

4        A.   Indirectly.

5        Q.   -- it goes up.  In the restaurants where

6    these point-of-sale systems are or where there's

7    ordering systems such as software or SAS platforms,

8    are these -- does the money in these go directly to

9    franchisees through the point-of-sale systems?

10        MR. BERNTSEN:  Object to form.

11        THE WITNESS:  Yes, directly to the

12    franchisee.

13    BY MR. CLEGG:

14        Q.   Does any of it indirectly -- oh, I should

15    say do any of that money that flows through the

**CONFIDENTIAL - FILED UNDER SEAL**

16    system split out in portions where a portion to goes

17    to the franchisee and portions go to the franchisee?

18    Does that make sense?

19           MR. BERNTSEN:  Object to form.

20    BY MR. CLEGG:

21      Q.    Somebody makes an order, money comes in and

22    that system automatically directs the money to

23    multiple parties.  One party may get a percentage of

24    it, another party may get another percentage of it.

25    Are the systems within the franchisee's walls, are

                        32

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1     UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2    any of those that type of a system?

3      A.    No.

4      Q.    So the money just goes directly to the

5    franchisee?

6      A.    Correct, and they're responsible for a

7    royalty payment or a royalty is based upon sales,

8    gross sales.

9      Q.    Are you familiar with the -- the key terms

10    of the leases that the sub -- that the Dine Brands

11    subsidiaries have in terms of their franchisees?

**CONFIDENTIAL - FILED UNDER SEAL**

12          MR. BERNTSEN:  Object to form.

13          THE WITNESS:  In a general sense.

14          MR. CLEGG:  What's the objection on that

15  basis?

16          MR. BERNTSEN:  I don't know what you mean

17  by "key terms."

18          MR. CLEGG:  Material terms.

19          MR. BERNTSEN:  The same objection.

20          MR. CLEGG:  Okay.

21      Q.   For example, who owns the building in those

22  leases?

23      A.   Who owns the building where?

24      Q.   Yeah.  Let's -- let's take a -- are those

25  typical leases or are they all standard is there a

                                                    33

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

↑

1      UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2  standard form?

3      A.   No pretty -- they're all different because

4  it was signed and executed at different times,

5  different people handle them, you know.

6      Q.   So you don't have with franchisees sort of

7  a package deal where a franchisee come in and you

8  have a kind of standard set of documents, standard

**CONFIDENTIAL - FILED UNDER SEAL**

```
 9    set of leases?

10         A.   There will be a standard set but those are

11    all negotiable and the franchisee would come back

12    and renegotiate those terms.

13         Q.   In the leases of properties owned by Dine

14    Brands subsidiary in Utah do you know who owns the

15    signage on the buildings?

16         A.   That would be owned by the franchisee.

17         Q.   Who owns the branded items attached to the

18    buildings like the sticker and things?

19         A.   The franchisee.

20         Q.   And the computer systems?

21         A.   Other than -- no, I mean -- the POS of IHOP

22    is owned by Micros -- is owned by a franchisee but

23    operated by Micros.

24         Q.   Operated by who?

25         A.   Micros.
```

                                                          34


                UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

↟


```
 1         UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 2         Q.   Is Micros a subsidiary of Dine Brands?

 3         A.   No, third-party vendor.

 4         Q.   Third party vendor.  Who pays the license
```

**CONFIDENTIAL - FILED UNDER SEAL**

```
5      to the point -- to that POS system?

6             MR. BERNTSEN:  Object to form.

7             THE WITNESS:  I couldn't answer directly

8      who pays.  Presumably, it's going to be the

9      franchisee.

10     BY MR. CLEGG:
```

█      █     ████████████████████████
█            ███████████████████████████
█            ██████████    ██████████
█            ██████████    ████████████████
█      ██████████████████    ██████████████
█      ████████████████████████████
█      ████████████████████████████
█      █████████████████████████████
█      ██████████████
█      █    █████████████████████
█      ██████████████
█      █   ████████
█            ██████████    ██████████
█            ██████████  █    ███████████
█      ████████████████████████    █

35

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

```
1      UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE
```

**CONFIDENTIAL - FILED UNDER SEAL**



36

**CONFIDENTIAL - FILED UNDER SEAL**

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

22            Q.   Let's turn briefly to page 26 of the annual

**CONFIDENTIAL - FILED UNDER SEAL**

23    report.

24          A.   (Complies.)

25          Q.   The first highlighted section there says

                                                        37

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1     UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2     that "Of the 1,669 IHOP restaurants operated by

3     franchisees, 58 were located on sites owned by us,

4     618 were located on sites leased by us from third

5     parties and 993 were located on sites owned or

6     leased by franchisees."

7          Previously you mentioned that none of the

8     properties in Utah are owned by Dine Brands; is that

9     correct?

10         A.   That's correct.

11         Q.   So not -- so were any of the sites leased

12    from third parties?  Were any of the IHOP franchisee

13    locations in Utah leased from third party owners of

14    those properties?

15         A.   Yes, there's several.

16              MR. BERNTSEN:  Objection to form.

17    BY MR. CLEGG:

18         Q.   And who -- who has those leases?

19         A.   Franchisee or the landlord.

**CONFIDENTIAL - FILED UNDER SEAL**

20        Q.   Is so the franchisee directly leased them

21   from third parties?

22        A.   Yes.

23        Q.   Okay.  According to this it says that

24   they're leased by quote us from third parties.  Are

25   none of the one in Utah leased by Dine Brands or its

                                                     38

                UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 2   subsidiaries from third parties?

 3        A.   There are several that are leased by IHOP,

 4   LLC or properties or IHOP Realty to the franchisees.

 5        Q.   So they're leased -- so let me -- let me

 6   clarify or let me get and clarification here are you

 7   saying there are third party properties that are

 8   leased by IHOP that are then used by the

 9   franchisees?

10        A.   Subleased to a franchisee.

11        Q.   Okay.  Do you know how many of those there

12   are?

13        A.   No.  Nationwide or in Utah?

14        Q.   In Utah.

15        A.   Handful, maybe.

**CONFIDENTIAL - FILED UNDER SEAL**

16          Q.   And would the lease or be -- I should

17     say -- so the lessee would be IHOP and the sublessee

18     would be the franchisee?

19          A.   Correct.

20          Q.   And then the franchisee would pay IHOP

21     under the lease?

22          A.   Yes.  Yeah.  IHOP owned a lot of

23     restaurants and built a lot of restaurants, and as a

24     consequence the ones that they lease under our

25     master lease can be terminated or decided to keep

                                                         39

                 UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

                 UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1           it.

3           Q.   Okay.  On this same page on the annual

4      report it says leases of IHOP restaurants generally

5      provide for an initial term of 20 to 25 years with

6      most having one or more five-year renewal options.

7      Is that the case for the franchisees in Utah

8      franchisees of IHOP?

9           A.   Well, I didn't check the terms of the lease

10     but in a general sense yeah 20 with options to the

11     lease.

12          Q.   Okay.  Down below it says because -- so

**CONFIDENTIAL - FILED UNDER SEAL**

13      down below the second or third highlighted section

14      on that same page?

15          A.    Right.

16          Q.    See where it says because substantially all

17      IHOP franchisee restaurants developed by us under

18      our previous IHOP business model are sublease today

19      the franchisees IHOP has the ability to regain

20      possession of the subleased restaurant if the

21      franchisee default in payment of the rent or other

22      temples of the settlements.  How many of the Utah

23      IHOP is this true for?

24          A.    Without reviewing each individual lease I

25      wouldn't know.

                                                        40

                UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1               UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2           Q.    Okay.  When the -- when the company --

3       well, I'll say when IHOP regains possession of a

4       property is that regained by IHOP, LLC or another

5       entity who takes possession of the property?

6               MR. BERNTSEN:  Object to form.

7               THE WITNESS:  I can't definitely say.

8       BY MR. CLEGG:

**CONFIDENTIAL - FILED UNDER SEAL**

9          Q.   Going to page 43 of the annual report down

10    at the bottom it says -- in the last highlighted

11    section, it says financing operations revenue

12    primarily consist of interest income from the

13    financing of franchisee fees and equipment leases.

14          Do you see that there?

15          A.   Yeah.

16          Q.   Are there any equipment lease in place

17    where Utah franchisees of IHOP?

18          A.   No.

19          Q.   So there's no revenues in Utah generated

20    through financing operations?

21          A.   Not for equipment leases.

22          Q.   Are there financing operation revenues for

23    anything else that come out of Utah?

24          MR. BERNTSEN:  Object to form.

25          THE WITNESS:  Just the rental whatever

                                                    41


          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE


1     UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2     leases are in -- are in effect.

3     BY MR. CLEGG:

4          Q.   And part of that consist of interest coming

5     off of those?

**CONFIDENTIAL - FILED UNDER SEAL**

6          A.   It could be.

7               MR. BERNTSEN:  Object to form.

8               MR. CLEGG:  What's the objection?

9               MR. BERNTSEN:  Vague as to interest coming

10     off of leases.

11              MR. CLEGG:  Accruing from leases.

12              MR. BERNTSEN:  Interest and leases don't

13     come to be in my mind.  That's the objection.

14              MR. CLEGG:  Do you finance leases?

15         A.   We do.

16         Q.   So would that be IHOP, LLC or would it be

17     Dine Brands?

18         A.   It's not Dine Brands.  It would be IHOP,

19     LLC or one of its subsidiaries.

20         Q.   Does Dine Brands finance anything?

21              MR. BERNTSEN:  Object to form.

22              THE WITNESS:  I couldn't really say.  I

23     mean --

24     BY MR. CLEGG:

25         Q.   You don't know?

                                                    42


          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE



1          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

**CONFIDENTIAL - FILED UNDER SEAL**

```
2          A.   Brands, no.

3          Q.   Okay.  Previously we -- well, let me ask

4     you this:  Let's go to the back of the annual report

5     and there's an Exhibit 23.1.  It's page 107.  I

6     don't approximate know if that helps you?

7          A.   Yes, it does.

8          Q.   Does it?

9          A.   Yeah.

10         Q.   Okay.  So this is a list in the annual

11    report of subsidiaries of Dine Brands Global, Inc.

12    In reviewing this, does this help refresh your

13    recollection of what entities may own property in

14    Utah?

15         A.   To a certain extent.

16         Q.   Are you able to go through and identify

17    some of them?

18              MR. BERNTSEN:  Object to form.

19              THE WITNESS:  Identify which?

20         Q.   Which of these subsidiary own properties in

21    Utah?

22         A.   IHOP Property, IHOP Leasing.

23         Q.   So IHOP Property, IHOP Leasing.  Any

24    others?
```

**CONFIDENTIAL - FILED UNDER SEAL**

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

6              MR. CLEGG:  Okay.  We been going about an

7        hour would it be okay to take a five- or ten-minute

8        break for the restroom or --

9              THE WITNESS:  Absolutely.  Get a cup of

10       coffee.  Fine.

11             MR. CLEGG:  Does that work for you?

12             THE WITNESS:  Yeah.  Fine.

13             MR. CLEGG:  Okay.  And you've done this

14       before, so I think you understand that during breaks

15       we're not to discuss answers to questions and things

16       like that with our counsel.

17             THE WITNESS:  Yes, I do.

18             MR. CLEGG:  I assumed you did, but we

19       always have to --

20             THE WITNESS:  I know.

21             MR. CLEGG:  -- state it, so, thanks, Bill.

22             MR. BERNTSEN:  Off the record.

23             MR. CLEGG:  Off the record.

**CONFIDENTIAL - FILED UNDER SEAL**

```
      24              (A recess was taken.)
      25      BY MR. CLEGG:
                                                        44


              UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE
```

↟

```
       1      UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE
       2          Q.   Okay.  Mr. Taylor I just want to confirm
       3      I'm going back to our earlier discussions at the
       4      beginning of the deposition you had prepared
       5      essentially read your declaration.  You had read the
       6      pleading that's were related to the venue motions
       7      that; right?
       8          A.   Some pleadings.
       9          Q.   Some pleading and that's it?  Was there
      10      anything else you read?
      11          A.   I looked at a lease.
      12          Q.   You did look at a lease?
      13          A.   Yeah, familiarize myself with the content.
      14          Q.   Okay.  So you did --
      15          A.   Refresh --
      16          Q.   And then you only -- and other than that
      17      you only talked to your counsel?
      18          A.   Correct.
      19          Q.   And you looked at the lease before today?
```

**CONFIDENTIAL - FILED UNDER SEAL**

20          A.    Yes.

21          Q.    And was that to gather terms of the leases?

22          A.    Familiarity with the lease.

23          Q.    Would that be a lease that sort of see

24    similar in template or form to other leases with

25    respect to IHOP restaurants in Utah?

                                                        45

            UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

            UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1

2           A.    I would making -- I would make a

3     presumption that it's similar.

4           Q.    You would make a presumption that it's

5     similar?

6           A.    Yeah.

7           Q.    Okay.  In those leases between -- was that

8     a lease between IHOP, LLC?

9           A.    I believe it was IHOP Property.

10          Q.    And it was with one the franchisees from

11    Utah?

12          A.    Correct.

13          Q.    And in that lease was there an option for

14    cancellation of the lease?

15          A.    I didn't see one it might be --

16          Q.    Would you assume there would be the ability

**CONFIDENTIAL - FILED UNDER SEAL**

17     to terminate a lease?

18          A.   Well, I mean, it's -- it's kind of a

19     standard provision within --

20          Q.   Sure.

21          A.    -- most leases that you have certain

22     recommendations and cancelation provisions so --

23          Q.   Are the leases tied to a franchisee

24     package?  When I say "package," there's like a lot

25     of franchisees would have this sort of package of

                                                           46


               UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

✦


1          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2     documents.  It's sort of a package deal and multiple

3     agreements.  Is that lease part of a group of

4     agreements?

5          A.   I can't say whether that's actually package

6     with the other agreements or not.

7          Q.   You don't know?

8          A.   No.

9          Q.   Do you know whether there's any determines

10    to terminate the lease if the franchise is

11    terminated?

12          A.   No, I don't had know that.

CONFIDENTIAL - FILED UNDER SEAL

13        Q.   Are all of the franchisees agreements

14   understand the same subsidiary with respect to IHOP

15   in Utah?

16        A.   The agreements the franchise agreement

17   or --

18        Q.   The agreements -- well, I should ask this

19   question.  Is there a franchise agreement that

20   governs the relationship between the franchisees or

21   a franchisee and IHOP, LLC or one of Dine Brands'

22   subsidiaries?

23        A.   Yes.  There's a franchise agreement.

24        Q.   Okay.  Among the different franchisees in

25   Utah, are all of those with the same subsidiary of

                                                      47


          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE



1    UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2    Dine Brands for all the franchisee agreements?

3              MR. BERNTSEN:  Object to form.

4              THE WITNESS:  I wouldn't have knowledge of

5    that.

6    BY MR. CLEGG:

7         Q.   Is there more than one fran -- is there

8    more than one franchisee owner in Utah or is Peak

9    Restaurant Partner -- is Peak Restaurant a

**CONFIDENTIAL - FILED UNDER SEAL**

```
10        partner -- is Peak Restaurant Partners the only

11        franchisee owner of the various franchisees in Utah?

12                MR. BERNTSEN:  Object to form.

13                THE WITNESS:  I believe they're the primary

14        franchisee.

15        BY MR. CLEGG:

16            Q.   Are all of -- do they have more than one

17        franchise agreement or is there one that covers the

18        multiple locations the multiple IHOP locations

19        within Utah?

20            A.   I wouldn't have that knowledge of that.

21            Q.   Okay.  Did you do anything to prepare to

22        know some of these relation -- the -- the franchisee

23        relationship with Dine Brands or with Dine Brands

24        subsidiaries other than looking at this one lease?

25            A.   Just looking at the lease and the
                                                       48
```

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

```
 1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 2        declaration and your questions.

 3            Q.   I understand it's your testimony in an any

 4        revenues coming in from the IHOP franchisees in Utah

 5        go up first to IHOP, LLC, a subsidiary of Dine
```

**CONFIDENTIAL - FILED UNDER SEAL**

```
 6    Brands?

 7         A.   Can you restate that question a little bit?

 8         Q.   Yeah.  All of the revenues coming from IHOP

 9    franchisees that are in Utah, those revenues, are

10    they all directed to the same subsidiary of Dine

11    Brands or are they directed to different

12    subsidiaries of Dine Brands?

13         A.   I couldn't precisely tell you if the

14    revenues are split before they arrive you know LLC

15    leasing or properties whether they get the rent how

16    that -- the mechanics of it I wouldn't be able to

17    talk to.

18         Q.   And you didn't -- do you know who would

19    know that?

20         A.   Not offhand.

21         Q.   So you don't know who was in either Dine

22    Brands or its subsidiary would know how the revenues

23    flowed back to Dine Brands from franchisees --

24         A.   I would have to --

25         Q.   In Utah?
```

49

```
          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE
```

```
 1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 2         A.   -- talk to someone in the finance
```

**CONFIDENTIAL - FILED UNDER SEAL**

3    department --

4        Q.   Okay.

5        A.   -- for each brand.

6        Q.   And you also indicate that had IHOP

7    Leasing, LLC owns property in Utah but you don't

8    know how many properties?

9            MR. BERNTSEN:  Objection to the extent it

10   mischaracterizes.

11           THE WITNESS:  I -- there's got to probably

12   be a dozen that are either a ground lease where we

13   own the ground or a building.  I think we have two

14   buildings that we own and lease.  And then maybe

15   LLC -- it may be leasing LLC or properties LLC as I

16   said leasing are all different.

17   BY MR. CLEGG:

18       Q.   And you indicated somewhere you own the

19   building and not the property?

20       A.   Could be.

21       Q.   Is that where you're leasing the property

22   and then you build on the property?  When I say

23   "you," I mean -- I'm assuming this would be IHOP,

24   LLC or the IHOP subsidiary that -- well, no, I'm

25   sorry.  IHOP Leasing, for example, would lease

                                                    50

**CONFIDENTIAL - FILED UNDER SEAL**

1     UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2     property from a third party and build on that and

3     own the property in some instance and in other

4     instances it would own the property and the

5     building?

6              MR. BERNTSEN:  Object to form.

7     BY MR. CLEGG:

8         Q.   It sounds like there's two different

9     situations is that right?

10        A.   Yeah.  That's correct.

11        Q.   In one situation there would be superior

12    court owned in a by IHOP Leasing; is that correct?

13        A.   That could be yes.

14        Q.   And another situation there would be a

15    scenario where IHOP Leasing would represent or lease

16    just the ground but build on it and would own the

17    building but not the ground.  Not the real estate.

18        A.   Well, I think if you go back to when the

19    properties were developed.

20        Q.   Yeah.

21        A.   That could be the case.  They didn't buy

22    the property on it.  But had built an IHOP on it.

23    But there's you know just so we lease the ground --

**CONFIDENTIAL - FILED UNDER SEAL**

24      we are the ground lessor.

25          Q.   Lee see?

                                                                 51


        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE



1       UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2           A.   Lease sea and it goes down from there.

3           Q.   Okay.  And that would be subleased to the

4       franchisee in the sense that you're leasing the

5       property and the building to the sub -- to the

6       franchisee?

7           A.   I don't --

8           Q.   ; is that correct?

9           A.   Know you could lease.  We might maintain

10      the lease of the ground and just lease it as a

11      package I don't -- I wouldn't know without

12      specifically looking into it.

13          Q.   Okay.  Okay.  You mentioned that before

14      that Dine Brands inspects the franchises in Utah or

15      did you say the subsidiary?

16          A.   Subsidiary of Dine Brands -- subsidiary of

17      Dine Brands.

18          Q.   So are these inspectors employees or

19      contractors?

20          A.   Employees of IHOP.

**CONFIDENTIAL - FILED UNDER SEAL**

```
21          Q.    And IHOP pays them.  IHOP hires these

22     inspectors?

23          A.    Yes.

24          Q.    And IHOP pays them?

25          A.    They're not -- yes.  They're not actually
```
                                                            52

          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

```
1          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2     inspectors though they're called business

3     consultants.

4          Q.    Business consultants?

5          A.    Yeah.

6          Q.    And are they W-2 employees of IHOP?

7          A.    Yes.

8          Q.    Would any of them be paid by Dine Brands?

9          A.    Not to my knowledge.
```

**CONFIDENTIAL - FILED UNDER SEAL**

17        Q.   And are any of those employees that are

18   the -- do work in Utah?

19        A.   Not that I'm aware of, yeah.

20        Q.   Okay.  What about are any of them employees

21   of inspectors or business consultant that's go to

22   Utah?

23        A.   No.

▮          ▮    ▮▮    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮        ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

                                                        53

          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE


1         UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

▮          ▮    ▮▮    ▮▮▮▮▮▮▮▮▮▮

▮          ▮    ▮▮

▮          ▮    ▮▮▮▮

5              MR. BERNTSEN:  We seem to be pretty far

6    afield from the topics here.  Which topic are we

7    focused on right now?

8              MR. CLEGG:  We'll get there.

9              MR. BERNTSEN:  Okay.

10             MR. CLEGG:  This has to do essentially

11   co-management, co-finances so --

12        Q.   So on page 9 of the annual report there's a

13   highlighted section there where it dates that Dine

**CONFIDENTIAL - FILED UNDER SEAL**

14      Brands continuously monitors franchise operations.

15      Is that an accurate statement right there at the

16      top?

17          A.   Generally, yes.

18          Q.   When we talk about monitoring franchise

19      operations is that the same as inspection of

20      franchises where you send 1 or 2 people out to Utah

21      to look at the operations of the franchisees and see

22      if they're complying with --

23          A.   Yeah.

24          Q.   With terms of the franchise agreements?

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1      UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE



55

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

**CONFIDENTIAL - FILED UNDER SEAL**

13   Q. What happens if the franchisee does not

14 meet food safety standards?

15   A. They're reaudited and corrective action is

16 taken.

17   Q. What type of corrective action could take

18 place?

19   A. Well, it could have egg -- eggs that are

20 not being stored properly --

21   Q. Right.

22   A. -- to room -- you know, to the temperature.

23   Q. Right.

24   A. It could be no cutting gloves.  It could be

25 hygiene.  You know, generally what you'd expect a

                    56

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1  UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2 restaurant to operate in a safe manner.

**CONFIDENTIAL - FILED UNDER SEAL**

3          Q.   Could a franchisee lose their franchise if

4     they didn't comply with request to modify what

5     they're doing for safety purposes for food safety?

6               MR. BERNTSEN:  Object to form.

7               THE WITNESS:  I mean, we had that option.

8     BY MR. CLEGG:

9          Q.   All right.

10         A.   But most of the time through corrective

11    action they don't want to lose their franchise.

12         Q.   Right.

13         A.   License.

14         Q.   What other kinds -- what other

15    noncompliance -- well, let me rephrase this.

16              Can -- can a franchise -- so are -- what

17    other types of inspection failures or monitoring

18    failures could cause a franchisee to lose their

19    franchise?

20         A.   Well, I think what you're asking me for

21    is -- would be repeated offenses probably in food

22    safety.  I mean, it's a very, very subjective area.

23         Q.   Okay.

24         A.   If you were committing fraud, not reporting

25    sales correctly.

                                                        57


              UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

**CONFIDENTIAL - FILED UNDER SEAL**

1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2        Q.    Now, when you say "subjective," by that you

3    mean that the -- there's discretion on the part of

4    Dine Brands to cancel a franchise?

5        A.    Well, there's obviously there's a committee

6    that looks and reviews --

7        Q.    Okay.

8        A.    -- certain issues with the franchisee

9    and --

10       Q.    This is a Dine Brands committee?

11       A.    No it would be IHOP.

12       Q.    IHOP?

13       A.    -- and respective brands.

14       Q.    Okay.  What about branding failures?

15   Can -- how can -- I guess an inspection could be

16   failed for improper branding?  I'm talking about the

17   business consultants now a business consultant goes

18   out to a franchise and what ways can they fail an

19   inspection, the franchisee?

20       A.    Oh, it could be cleanliness.  It's not so

21   Draconian.

22       Q.    Okay.

23       A.    Whereas we just shut the doors and lock it

24   lock the place up.

**CONFIDENTIAL - FILED UNDER SEAL**

```
25        Q.   But you could do that?
                                                    58


          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE



1         UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2              MR. BERNTSEN:  Object to form.

3              THE WITNESS:  I -- I can't answer that

4    question.

5    BY MR. CLEGG:

6         Q.   Who would know the answer to that?

7         A.   It probably no, I don't know because I

8    don't sit on the council for review committee.

9         Q.   What is this are review committee or

10   council that you're talking about is there an

11   official name for it?

12        A.   I believe it's called the franchise review

13   committee.

14        Q.   Is that at Dine Brands?

15        A.   That is at corporate headquarters, yes.

16        Q.   At Dine Brands Incorporated headquarters?

17        A.   Yeah.

18        Q.   Do you know what other terms within the

19   franchise agreement agrees with franchisees and IHOP

20   that would permit them to terminate a franchise
```

CONFIDENTIAL - FILED UNDER SEAL

21      agreement?

22              MR. BERNTSEN:  Object to form.

23              THE WITNESS:  There's a variety of like I

24      said if you're not reporting royalties you're

25      committing fraud, basically they have to operate

                                                    59

        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1       UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2       within the state and federal and local regulations.

3       BY MR. CLEGG:

4           Q.   Are those determinations generally made by

5       the review committee at Dine Brands head quarter?

6           A.   Determination for --

7           Q.   Whether to --

8           A.   Terminate.

9           Q.   -- a franchise?

10          A.   I believe that's one role that they play.

11          Q.   Okay.  Would that also be true for

12      Applebee's franchise agreements?

13          A.   That I can't speak to.

14          Q.   It indicates that -- okay.  So Dine

15      Brands -- does Dine Brands provide oversight of any

16      practices or procedures of the -- of the

17      franchisees?

**CONFIDENTIAL - FILED UNDER SEAL**

18      A.   No that's all within the brand.

19      Q.   They do not have brand is that what you

20   mean?

21      A.   Yeah within the IHOP brand.

22      Q.   Okay.  What happened if a franchisee

23   selects a franchise site that is not acceptable to,

24   let's say, Dine Brands?

25      A.   We just assist the -- as I understand we

                                                        60

          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE



1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2    assist the franchisee in selection, but I don't

3    think we dictate.

4       Q.   Yeah.  Are franchisee required to provide

5    statements Dine?

6       A.   Yes, when we apply for a franchise

7    operation.

8       Q.   Can Dine require the franchisees financial

9    practices to make sure they secure their financial

10   health?

11      A.   That's a very obtuse question.  Could you

12   repeat it for me?

13      Q.   Well, they provide financial statements

**CONFIDENTIAL - FILED UNDER SEAL**

14      franchisees they have a potential franchisee or a

15      franchisee provides a financial statement to Dine.

16      And then Dine looks at it and says hey, your

17      financial practices, what are you doing here is not

18      up to par.  In other words, could -- in their

19      discretion could Dine tell them you need to change

20      these procedures that you're doing financially

21      because your financial health is not good and we

22      don't want you to fail as a restaurant?  Do they

23      have the ability to tell them how to do their

24      finances in any way?

25          A.   No, we don't.

                                                        61


            UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

↑


1           UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2               MR. BERNTSEN:  Object to form.

3               THE WITNESS:  We -- we will assist the

4       franchisee in a variety of ways if there's financial

5       health concerns.  But as far as changing their

6       accounting and financing policies, no.  We don't get

7       involved in the day-to-day operations of the

8       franchisee like that.

9       BY MR. CLEGG:

10          Q.   Okay.  Page 8 of the annual report it says,

**CONFIDENTIAL - FILED UNDER SEAL**

```
11      starting with the second sentence, it says, "We also

12      conduct a physical inspection, review any proposed

13      lease or purchase agreement for compliance with our

14      requirements and may make available to franchisees

15      demographic and other studies for domestic

16      restaurants."

17           So that second part where it says --

18      that -- that you review any proposed lease or

19      purchase agreement for compliance with, quote, our

20      requirements, unquote, what were -- what

21      requirements are those?

22           A.  For example, insurance requirements.

23           Q.  Are there others?  Are there other

24      requirement they have?

25           MR. BERNTSEN:  Object to form.
```
                                                         62

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

⬧

```
1       UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2       BY MR. CLEGG:

3            Q.  With respect to lease and purchases and

4       lease agreements?

5            A.  There are but I didn't delineate those.

6            Q.  What happens if they don't meet those
```

**CONFIDENTIAL - FILED UNDER SEAL**

7    requirements?

8         A.   I guess --

9         Q.   Do they lose a franchise?

10        A.   No, I don't think we're that difficult to

11   work with it's more a collaborative process.

12        Q.   Let's say you are not difficult but the

13   franchisee is difficult and they don't want to

14   comply with some of the requirements?

15        A.   If the review committee found those

16   requirements lack of complying with the requirements

17   egregious, just it depends on the extent.

18        Q.   Okay.  Also on page 8 in the same section

19   at the end of it says, "We make the design

20   specifications for a typical restaurant available

21   for franchisees and we retain the right to prohibit

22   or modify the use of any set of plans."

23             Is that true?

24        A.   I read it as being true.

25        Q.   So a franchisee couldn't change the layout

                                                      63

             UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

↟

1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2    of the restaurant if they wanted?

3         A.   They could.  But we have a variety of

**CONFIDENTIAL - FILED UNDER SEAL**

4    different footprints that we offer and it depends on

5    what structure it's going into.

6         Q.   Would IHOP -- would be it the review

7    committee or would it be IHOP that would need to

8    approve it?

9         A.   It would be the brand that would need to

10   approve it probably someone in their construction or

11   architectural.

12        Q.   In the same place it says -- looking at the

13   first sentence of that highlighted area of page 8 of

14   the annual report it says we may consult with

15   franchisees when they are selecting particular site

16   and the selection made by franchisees are subject to

17   our approval.  What I what kind of requirements is

18   needed to get approval is that the brand approval or

19   is that the design committee approval?

20        A.   It would probably be the planning

21   committee -- you know, the planning committee.

22   So --

23        Q.   And who is the planning committee with?

24        A.   Probably the same ones under review

25   committee.

                                                    64


UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

**CONFIDENTIAL - FILED UNDER SEAL**

```
 1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 2        Q.   Okay.

 3        A.   Yeah, one and the same.

 4        Q.   Okay.  And that's at corporate

 5   headquarters?

 6        A.   Yes.

 7        Q.   Okay.

 8             MR. BERNTSEN:  Again, we seem to be getting

 9   pretty far away from the topics that have been

10   approved by the Court.  So if you would tell me

11   which topic we're talking about, that's fine, but I

12   will consider if an objection is appropriate.

13   BY MR. CLEGG:

14        Q.   Okay.  Let's move to --

15             MR. CLEGG:  I'm going to hand you another

16   exhibit here.  And I think this is going to be

17   Exhibit 4.

18             (Exhibit 4 was marked for

19             identification by the reporter.)

20             THE WITNESS:  Thank you.

21   BY MR. CLEGG:

22        Q.   As you can see this is a printout from

23   dinebrands.com corporate governance and if you turn

24   to page 6 it says "Management."  There's a header
```

**CONFIDENTIAL - FILED UNDER SEAL**

25    there that says "Management."

65

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1      UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2          A.    Uh-huh.

3          Q.    Do you see that?

4              MR. BERNTSEN:  Sorry, I don't see that on

5      page 6.

6              THE WITNESS:  "Indicating."

7              MR. BERNTSEN:  Page 5 you mean.

8              MR. CLEGG:  It is five.  I apologize.  It's

9      page 5 out of 6.  I was -- I misread the page

10     number.  Thanks, Matt.  I'm glad we brought you to

11     the deposition.

12             MR. BERNTSEN:  Just here to help, Perry.

13             MR. CLEGG:  Thank you.

14         Q.    The list of management here, these officers

15     of Dine Brands, it -- I assume these are all Dine

16     Brands' officers; is that correct?

17         A.    Oh, I think Jay Johns and Cywinski are

18     officers of the brands; right?

19         Q.    They're brand officers?

20         A.    Yeah.

21         Q.    And Stephen Joyce -- well, let me ask you

**CONFIDENTIAL - FILED UNDER SEAL**

22      is this -- does this list of officers look current

23      to you?  Are you familiar with these officers?

24          A.   I am.  Amy Mason is no longer with the

25      company.

                                                        66

        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1           UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2           Q.   Okay.  But the rest of them are still

3       current?

4           A.   Yes.

5           Q.   Okay.  Did somebody replace Amh?

6           A.   What's that?

7           Q.   Did somebody replace Amy or did they

8       eliminate her position?

9           A.   I don't know.

10          Q.   Okay.

11          A.   What the reason was for that.

12          Q.   Fair enough.  Do any of the officers listed

13      hereby on Exhibit 4 are they also officers of any of

14      the subsidiaries that were listed in the annual

15      report?

16          A.   I can't answer that.  I wouldn't know.

17          Q.   You don't know if they're officers -- if

**CONFIDENTIAL - FILED UNDER SEAL**

18    any of the subsidiaries also have -- if any of these

19    are also --

20         A.   I couldn't definitely say.  Ultimately,

21    they are a less known corporate structure.

22         Q.   Okay.  What about Jay Johns is he an

23    officer of any of the subsidiaries for IHOP in their

24    name other than -- other than the IHOP -- the --

25         A.   As I said, I can't definitely say which

                                                          67

         UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1         UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2    subsidiaries he would be an officer of the company.

3         Q.   Is the same true for John -- how do you

4    pronounce the names?

5         A.   John Cywinski.

6         Q.   John Cywinski.

7              And did you need the spelling of that?

8    It's a little bit difficult.  Let me show you.

9              THE WITNESS:  It's not exactly how it

10   sounds it.

11             MR. CLEGG:  Were you able to see that?

12   Great.

13        Q.   So you don't know if John Cywinski is an

14   officer also of other subsidiaries besides the main

**CONFIDENTIAL - FILED UNDER SEAL**

15   Applebee's?

16        A.   No.  I wouldn't be able to say.

17             MR. CLEGG:  I'm going to hand you another

18   exhibit.  This would be Exhibits 5 and -- let's

19   start with Exhibit 5.  It will be Exhibit 5 and 6.

20             (Exhibits 5 and 6 were marked for

21              identification by the reporter.)

22   BY MR. CLEGG:

23        Q.   Exhibit 5 is a printout from Utah's

24   Division of Corporations.  It's a business search

25   for data on businesses in Utah.  And this is for

                                                  68

             UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

⬆

1    UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2    IHOP Leasing, LLC.  And this is a list of the

3    registered principals for the company.  And you

4    indicate that had IHOP Leasing owns property in Utah

5    and also leases some property to some of the

6    franchisees; is that correct?

7         A.   IHOP Leasing or IHOP Realty --

8         Q.   Okay.

9         A.   -- would be part of it.

10        Q.   And if you look here are there any of the

**CONFIDENTIAL - FILED UNDER SEAL**

11          names here that you recognize that were also on the

12          list of officers for Dine Brands?

13                    MR. BERNTSEN:  To be clear that's the list

14          of officers in Exhibit 4?

15                    MR. CLEGG:  Exhibit 5.  Oh, yes, yes.  I

16          apologize you're referencing -- yeah, the Dine

17          Brands officers listed on Exhibit 4.

18                    THE WITNESS:  And do I what?

19          BY MR. CLEGG:

20               Q.   Well, let me give you an example.  Are

21          you -- Bryan -- Bryan Adel, you --

22               A.   Yes.

23               Q.   You're familiar with Bryan Adel?

24               A.   Yes.  I report to him.

25               Q.   You do you report to Bryan Adel?

                                                              69

               UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE



 1             UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 2               A.   Yes.

 3               Q.   And is he senior VP and general counsel for

 4          Dine Brands?

 5               A.   His title is senior vice president and

 6          corporate secretary, general counsel.

 7                    MR. CLEGG:  Let's do this.  I'm going to --

**CONFIDENTIAL - FILED UNDER SEAL**

8      pull out another exhibit here so that we can -- this

9      will be Exhibit 6.  And I'm only handing you this I

10     actually wanted to talk about the exhibits after

11     this but this Exhibit 6 relates to Exhibit 5 but

12     after this going to hand you a couple other exhibits

13     so that we can then refer back to Exhibit 5 and 6

14     but Exhibit 6 is the most recent annual report from

15     the Department of Commerce and Division of

16     Corporations for the state of Utah where it is

17     identifying the registered principals for IHOP

18     Leasing so we can come back to that.  But what I

19     wanted to provide you also were some officer bios

20     that come from Dine Brands' Website.  So we can

21     start with Exhibit 7.

22              (Exhibit 7 was marked for

23              identification by the reporter.)

24              THE WITNESS:  Thank you.

25     BY MR. CLEGG:

                                                70


            UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

↟


1      UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2          Q.   This is the bio from Dine Brands' Website

3      for Bryan Adel.  It says he's senior vice president,

**CONFIDENTIAL - FILED UNDER SEAL**

```
 4      legal, general counsel and secretary.  Is that
 5      accurate?
 6          A.   Yes.
 7              MR. CLEGG:  And I'm going to hand you
 8      Exhibit 8.  This likewise is a bio -- this being a
 9      bio for Stephen P. Joyce.  And it's from the Dine
10      Brands Website.
11              (Exhibit 8 was marked for
12              identification by the reporter.)
13      BY MR. CLEGG:  It says that Stephen Joyce is the
14      chief executive officer and director for Dine
15      Brands; is that correct?
16          A.   Correct.
17              MR. CLEGG:  And this will be Exhibit 9.
18              (Exhibit 9 was marked for
19              identification by the reporter.)
20      BY MR. CLEGG:
21          Q.   And Exhibit 9 is also from Dine Brands
22      Website and it's a bio for Thomas Song, and it
23      indicates that Thomas Song is the chief financial
24      officer for Dine Brands; is that accurate?
25          A.   It's accurate.
```

71

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

**CONFIDENTIAL - FILED UNDER SEAL**

```
 1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE
 2        Q.   Okay.  Now, let's refer back to Exhibit 5
 3   and 6 which essentially have the same information
 4   that identifies managers for IHOP Leasing, LLC from
 5   the Utah Division of Corporations database.  It
 6   indicates here that Bryan Adel is a manager of IHOP
 7   Leasing, LLC; is that true?
 8             MR. BERNTSEN:  Object to form.
 9             THE WITNESS:  That's what it indicates.
10   BY MR. CLEGG:
11        Q.   Do you know what his title would be there
12   at IHOP Leasing?
13             MR. BERNTSEN:  Object to form.
14             THE WITNESS:  I would not.
15             MR. CLEGG:  What's your objection based on?
16             MR. BERNTSEN:  Foundation.  It assumes he
17   has a title.
18             MR. CLEGG:  Okay.
19        Q.   Do you know whether Bryan Adel would be
20   anything other than a -- in his role as a manager
21   whether he would have some other title?
22        A.   No.
23             MR. BERNTSEN:  Object to form.
24             THE WITNESS:  I don't.  I wouldn't know
25   that.
```

**CONFIDENTIAL - FILED UNDER SEAL**

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1      UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2    BY MR. CLEGG:

3      Q.    Okay.  Down below it indicates that

4    Stephen Joyce is a manager of IHOP Leasing LLC.  Do

5    you know whether or not that's true?

6      A.    No.  Other than what's indicated here.

7      Q.    Okay?

8      A.    No.

9      Q.    And as to -- down below that it indicate

10   that's Thomas Song is a manager?

11     A.    That's what it indicates, yes.

12     Q.    Okay.  Do you know whether Bryan -- well,

13   would you assume that the role that Bryan Adel plays

14   in this company would be legal in nature?

15         MR. BERNTSEN:  Object to form.

16         THE WITNESS:  Yes, I would consider it.

17   BY MR. CLEGG:

18     Q.    Would it be likely that the roles they play

19   in this company are similar to the roles at Dine

20   Brands?

21     A.    That, I can't answer.

**CONFIDENTIAL - FILED UNDER SEAL**

22      Q.   Okay.  Are you aware of any of these three

23  officers of Dine Brands also being managers or

24  officers of other subsidiaries?

25      A.   No, I'm not aware of it.

                                                    73


            UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE


 1          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 2      Q.   So would it be correct to say that Dine

 3  Brands global CEO CFO and general counsel are all

 4  registered principals of IHOP Leasing?

 5          MR. BERNTSEN:  Object to form.

 6          THE WITNESS:  I can't say that from this.

 7  BY MR. CLEGG:

 8      Q.   Do you know who would know this

 9  information?

10      A.   I wouldn't know.

11      Q.   Do you know what responsibilities Bryan

12  Adel would have at IHOP Leasing?

13          MR. BERNTSEN:  Object to form.

14          THE WITNESS:  Well, by -- I did say earlier

15  that I don't know if he is an officer of IHOP

16  Leasing.

17  BY MR. CLEGG:

18      Q.   Okay?

**CONFIDENTIAL - FILED UNDER SEAL**

19          A.    Yeah.

20          Q.    And if he was an officer do you know what

21     responsibilities he would have?

22          A.    No, I wouldn't.

23          Q.    Let's turn back to exhibit -- I believe

24     this is Exhibit 1.  Sorry it will take me a second

25     to find it.  Will you look at topic 32?

                                                        74

            UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 1          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 2          A.    Okay.

 3          Q.    What does that say?

 4          A.    Common management between Dine Brands and

 5     it's affiliates and its subsidiaries.

 6          Q.    Did you do anything to prepare yourself to

 7     know about the -- you know what common management

 8     would be between any of Dine Brands' subsidiaries or

 9     affiliates?

10          A.    Not necessarily other than my general

11     knowledge of the roles.

12          Q.    Okay.  What about number 30 up above?

13     Could you read that Topic 30?

14          A.    Contractual and/or business relationship

**CONFIDENTIAL - FILED UNDER SEAL**

15      between Dine Brands and affiliate and subsidiaries

16      having property chattels, equipment leases or

17      business leases in Utah.   Sorry.

18          Q.   Is the same true for that topic that you

19      were just generally relying on your experience at

20      the company?

21          A.   Yes.

22          Q.   Would that be true also for all the topics

23      that have been identified too as topics that were

24      topics for the deposition today?

25              MR. BERNTSEN:  Object to form sorry could

                                                75


        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE


1       UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2       you restate that I want to make sure I got the

3       question clear in my head.

4               MR. CLEGG:

5           Q.   So I guess the question is as the topic we

6       just mentioned on topic 30 and 31 the witness

7       testified that his preparation was generally will I

8       with his experience within the company and I assume

9       the three documents that you identified earlier the

10      having looked at this Exhibit 1 having looked at

11      your declaration?

**CONFIDENTIAL - FILED UNDER SEAL**

```
12          A.   Right.

13          Q.   And I believe there was a pleading that you

14     looked at and then you talked with counsel?

15          A.   And then the lease --

16          Q.   The lease.

17          A.   Yeah.

18          Q.   Okay.  So with respect to Stephen Joyce you

19     don't know whether or not -- with respect to the

20     other three that -- the other two that were

21     identified so both Brine Bryan and Stephen Joyce

22     Thomas Song you don't have personal knowledge as to

23     whether they are or not management within IHOP

24     Leasing?

25          A.   No.  I wouldn't have personal knowledge of
                                                        76


            UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE
```

↑

```
1       UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2     that.

3          Q.   So the only information you have regarding

4     them being registered principals were based on the

5     documents I provided you from the Utah Division of

6     Corporations database?

7          A.   That's correct.
```

**CONFIDENTIAL - FILED UNDER SEAL**

```
 8          MR. BERNTSEN:  Object to form.

 9          THE WITNESS:

10          MR. CLEGG:  Okay.  I'm going to provide you

11     two more exhibits.  What was the last exhibit we

12     left off on nine.  So we'll do Exhibits 10 and 11.

13     Matt.

14     BY MR. CLEGG:

15          Q.   Okay.  So I will represent to you that

16     Exhibit 10 is a business registration form that was

17     taken from the Utah Division of Corporations

18     database so these were filings that were made.  And

19     this one here -- the document I suppose speaks for

20     itself.  And this is for Applebee's restaurants as

21     you can see right here at the top?

22          A.   Yes.

23          Q.   And at the back of it, it identifies

24     managers for Applebee's Restaurants, LLC.  Among

25     those it identifies Bryan Adel?
```
                                                        77

                UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

↑

```
 1     UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 2          A.   Yes.

 3          Q.   And you previously testified that he is

 4     general counsel for Dine Brands?
```

**CONFIDENTIAL - FILED UNDER SEAL**

```
5        A.    General counsel, secretary, yes.

6        Q.    Okay.  And senior vice president correct?

7        A.    Senior vice president.

8        Q.    And Julia Stewart, -- who is Julia Stewart?

9        A.    Former CEO.

10       Q.    Has she left the company now?

11       A.    Yes.

12       Q.    And what about Thomas Emrey?

13       A.    He's also left the company.

14       Q.    And Bernard Angelo?

15       A.    I'm not --

16       Q.    Kevin Burns?

17       A.    I'm not familiar with the name.

18       Q.    Okay.  So let's turn to Exhibit 11, and

19    Exhibit 11 is the most recent.  Do you see it's

20    dated -- it's the most recent filing for the annual

21    report for Applebee's -- so this it is the most

22    recent filing for the Division of Corporations for

23    the state of Utah for Applebee's LLC.  It's their

24    annual report with the registered list of

25    principals.  You'll see that's dated July 29, 2019.
```
78

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

**CONFIDENTIAL - FILED UNDER SEAL**

1       UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2       You'll notice on there it mentions Stephen Joyce.

3              Do you see that?

4       A.    Yes.

5       Q.    Do you have any reason to believe that

6       Stephen Joyce is not a manager of Applebee's

7       restaurants LLC?

8       A.    I can't confirm other than what's stated on

9       here.

10      Q.    A little bit further down it says Thomas H.

11      Song, and it identifies him as a manager.  Do you

12      have any reason to believe that Thomas Song is not a

13      manager of Applebee's Restaurants, LLC?

14      A.    Other than what's stated on here, I can't

15      confirm that.

16      Q.    And do you have any reason Mr. Add who is

17      general counsel of Dine Brands is not an officer of

18      Applebee's restaurants LLC?

19             MR. BERNTSEN:  Object to form it

20      mischaracterizes.

21             THE WITNESS:  Other than what I'm seeing

22      here no I can't confirm it.

23      BY MR. CLEGG:

24      Q.    Okay.  Do you know what Brian receives any

25      compensation for the work he does for Dine Brands or

**CONFIDENTIAL - FILED UNDER SEAL**

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2      for any of affiliates separately from Dine Brands or

3      is his salary all paid by Dine Brands?

4          A.   I really can't confirm that he doesn't get

5      paid by Dine Brands.

6          Q.   Would any of the affiliates pay him or any

7      of the subsidiaries pay Bryan Adel?

8          A.   I would think so.

9          Q.   I'm sorry is that?

10         A.   I wouldn't think so.

11         Q.   So is that a no?

12         A.   Yes, it's a no.

13         Q.   So he gets his compensation solely from

14     Dine Brands?

15         A.   I would -- yes.

16         Q.   Okay.  What about Thomas Song?  Does he get

17     his compensation solely from Dine Brands?

18         A.   He's a Dine Brands officer, so I would

19     assume he would get his compensation from Dine

20     Brands.

21         Q.   And not from its subsidiaries?

22         A.   No.  I wouldn't say so.

**CONFIDENTIAL - FILED UNDER SEAL**

23        Q.   Okay.  And what about Stephen Joyce?  Did

24   we mention Stephen Joyce already?

25        A.   No, I hadn't.

                                                        80

          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2        Q.   So Stephen Joyce, does he get his

3    compensation solely from Dine Brands?

4        A.   He's a Dine Brands' employee.

5        Q.   And he doesn't get payment from any of the

6    subsidiaries?

7        A.   Not to my knowledge.

8             MR. CLEGG:  I got a couple more exhibits,

9    and I guess the next exhibits will be 12 and 13.

10            (Exhibits 12 and 13 were marked for

11             identification by the reporter.) ^ 12, 13

12   BY MR. CLEGG:

13       Q.   Okay.  So Exhibit 12 I will represent to

14   you that this is a filing from there -- that was

15   taken from the Division of Corporations from the

16   state of Utah is this is a business registration

17   filing and this is for Applebee's Franchisor.

18            You can see that from the top?

**CONFIDENTIAL - FILED UNDER SEAL**

```
19        A.   Yes.

20        Q.   And it appears this was filed

21   September 23rd of 2014.  Do you see that right here

22   in the top right corner?

23        A.   Yeah.

24        Q.   On the back it it identifies Applebee's

25   Franchisor, LLC managers.  And down below there, do
```
                                                            81

                UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE


```
1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2   you see where it says Julia Stewart?

3        A.   Yes.

4        Q.   And you indicated she's the former CEO of

5   Dine Brands; is that correct?

6        A.   She maintained a couple titles.

7        Q.   Was one of them CEO?

8        A.   I believe so.

9        Q.   And Thomas Emrey, what was his title?

10        A.   CEO.

11        Q.   He was also --

12        A.   Oh, excuse me.  The CFO.

13        Q.   CFO?

14        A.   Yes, chief financial officer.

15        Q.   Okay.  And we've already mentioned Bryan
```

**CONFIDENTIAL - FILED UNDER SEAL**

16      Adel who is also named there --

17          A.   Right.

18          Q.   -- as the general counsel.  Okay.  Turning

19      to Exhibit 13, I'll represent to you that this was

20      the most represent -- recent annual report filed by

21      Applebee's Franchisor, LLC that we were able to take

22      from the department -- the Utah Division of

23      Corporations database.  Did -- if you go down there

24      one, two, three, four -- well, actually let's go up

25      one.  It says Dahl so if you go one, two -- let's

                                                        82

        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE



1          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2      say three -- three names down Richard Dahl, D-a-h l.

3              Who was Richard Dahl?

4          A.   Richard Dahl was acting as the CEO during

5      the interim period between Julia Stewart and Stephen

6      Joyce.

7          Q.   I see.  Is there any reason to believe he

8      at some point in time was not a mangers of

9      Applebee's Franchisor?

10          A.   I can't answer that.

11          Q.   Down below it mentions Stephen Joyce again?

**CONFIDENTIAL - FILED UNDER SEAL**

```
12      A.    Uh-huh.

13      Q.    Do you have any reason to believe he was

14   not a manager or officer of Applebee's Franchisor?

15      A.    I can't answer that other than what's

16   indicated on the sheet.

17      Q.    But you don't have anything to indicate he

18   wasn't?

19      A.    No.

20      Q.    And Thomas Song.  Do you have a reason to

21   believe that Thomas Song was not a manager or

22   officer of Applebee's Franchisor LLC?

23      A.    Other than what's indicated here I can't

24   confirm that.

25      Q.    Okay.  But Thomas Song would not have
```
                                                    83


                UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

↑

```
1       UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2    received compensation from Applebee's Franchisor

3    LLC; is that correct?

4            MR. BERNTSEN:  Object to form.

5            THE WITNESS:  I can't answer that.

6    BY MR. CLEGG:

7       Q.    You indicated that he would have received

8    his pay from Dine Brands?
```

**CONFIDENTIAL - FILED UNDER SEAL**

```
 9          A.   That's how the payroll --

10          Q.   That's how the payroll works?

11          A.   Yeah.

12          Q.   And that's true for each of the officers of

13     Dine Brands?

14               MR. BERNTSEN:  Object to form.

15               THE WITNESS:  I can't answer for Richard

16     Dahl.  Bernard Angelo.  Bernard Angelo.

17     BY MR. CLEGG:

18          Q.   But for the current officers of Dine Brands

19     that would be true?

20          A.   Corporate officers, yes.

21          Q.   Okay.  So I'd like to move on to talk a

22     little bit about Dine Brands relationships with

23     respect to its subsidiaries.  Do subsidiary make

24     business decisions separate from the direction of

25     Dine Brands?
                                                        84


           UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE



           UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 1

 2          A.   The brand subsidiary do make decisions.

 3          Q.   Are there other subsidiaries that would not

 4     make decisions independent of Dine Brands?
```

**CONFIDENTIAL - FILED UNDER SEAL**

```
 5          A.   I can't answer that question.

 6          Q.   You don't know the answer?

 7          A.   It's not a very concise question.

 8          Q.   Well, does it need to be concise to be --

 9          A.   I --

10          Q.   Is it you don't understand the question?

11          A.   Well, I need to articulate what decisions

12     we're talking about.

13          Q.   Okay.  The question was any decisions.  So

14     if there are some -- if there are some subsidiaries

15     that take direction at Dine Brands right direction I

16     mean if there are subsidiary directed by Dine Brands

17     then I test the question would be what subsidiaries

18     are those?

19          A.   I can't answer that.

20          Q.   And why is that?

21          A.   Because I don't have knowledge of the

22     decisions being made.

23          Q.   Okay?

24          A.   A brand makes decision on things.

25          Q.   But you're not aware of other subsidiaries
```

                                                          85


                UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE



```
 1          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE
```

CONFIDENTIAL - FILED UNDER SEAL

2       that are directed by Dine Brands?

3           A.    No.

4           Q.    Does Dine Brands able to veto any decision

5       as all by the brand subsidiaries?

6               MR. BERNTSEN:  Object to form.

7               THE WITNESS:  I believe we address that had

8       earlier.  That certain decisions would be applicable

9       to bring up to Dine Brands if it affected the

10      overall corporate value.

11      BY MR. CLEGG:

12          Q.    Like what kind of decisions would those be?

13          A.    Say an acquisition for IHOP another brand

14      that would be related to IHOP that would be a

15      decision of Dine Brands.

16          Q.    Okay.  Are there other ones?

17          A.    There's a multitude.

18          Q.    Why don't we start going threw them.

19      You're the one with the knowledge so that's why I'm

20      asking you so you'd know which decisions Dine Brands

21      can veto.  I can't guess at them.  That's why I'm

22      asking you?

23          A.    Yeah.  I can answer a specific question

24      regarding it, but I can't enunciate every decision

25      that Dine Brands would make versus the brand.

                                                        86

CONFIDENTIAL - FILED UNDER SEAL

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2        Q.    Give me some categories.

3        A.    Advertising.

4        Q.    So Dine Brands could veto advertising

5    decisions?

6        A.    Well, the apparently company could veto

7    anything it wants in general corporate law; right?

8        Q.    Okay.  So any decision then could be vetoed

9    by Dine Brands?

10        A.    If you want to take it to that extreme,

11    yeah.

12        Q.    Okay.  Could any of the officers at Dine

13    Brands take decisions that would veto an action by

14    any of the brand subsidiaries?  The IHOP brand in

15    Utah, for example, could Stephen Joyce make a

16    decision that would veto something by IHOP Leasing?

17            MR. BERNTSEN:  Object to form.

18            THE WITNESS:  I would say in his role as

19    CEO, he probably could.

20    BY MR. CLEGG:

21        Q.    Okay?

22            MR. BERNTSEN:  Could we take a break when

**CONFIDENTIAL - FILED UNDER SEAL**

```
23      you reach a spot it's been an hour when you reach a

24      spot.

25              MR. CLEGG:  Yeah.  Well, let me just get
                                                        87


        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE



 1      UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 2      through this these he's here and we'll do it.

 3      BY MR. CLEGG:

 4          Q.   Could Stephen Joyce veto a decision by the

 5      brand subsidiary the IHOP brand subsidiary with

 6      respect to some business decision in Utah?

 7              MR. BERNTSEN:  Object to form.

 8              THE WITNESS:  I would say a CEO again he

 9      probably -- he has ultimate decision making.

10      BY MR. CLEGG:

11          Q.   Okay.  What about Thomas Song does he have

12      the ability to veto decisions by IHOP brand

13      subsidiary?

14          A.   I wouldn't know that.

15          Q.   How about financial decisions?

16          A.   He would be involved.

17          Q.   Okay.

18          A.   And he would probably set out

19      recommendations to either the board or to Steve or
```

**CONFIDENTIAL - FILED UNDER SEAL**

20      to Brian.

21          Q.   Would he ever have certain decisions where

22      he could dictate things done by IHOP brands

23      subsidiary?

24          A.   I couldn't answer that.

25          Q.   With respect to financial matters?

                                                                88


                UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE



1               UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2           A.   He would be the lead financial matters,

3       yes.

4           Q.   With respect to IHOP brands?

5           A.   With respect to IHOP.

6           Q.   Okay.  And with respect to --

7           A.   Well, excuse me.

8           Q.   Sorry go ahead?

9           A.   Not with respect to IHOP.  He's Dine a Dine

10      Equity I believe so --

11          Q.   Okay.  Let's go back to Bryan Adel sorry

12      not go back but let's go to Bryan Adel.  Would Bryan

13      Adel have the ability to -- with respect to legal

14      matters that could impact subsidiaries as general

15      counsel of Dine Brands does he have the power to

**CONFIDENTIAL - FILED UNDER SEAL**

```
16    make decisions that could legally affect

17    subsidiaries such as IHOP brands or could they just

18    flaunt his advice?

19            MR. BERNTSEN:  Objection; form.

20            THE WITNESS:  I would have to look at his

21    -- at his position description --

22    BY MR. CLEGG:

23        Q.    Uh-huh.

24        A.    -- and the bylaws --

25        Q.    Okay.
                                                89


        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE



 1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 2        A.    -- which will state whether or not he has

 3    ultimate decision making power.

 4        Q.    Okay.  But as to Stephen Joyce, his

 5    relationship with respect to IHOP Leasing or IHOP

 6    brands and subsidiaries, would that -- would the

 7    same relationship and decision making power be true

 8    with respect to him with respect to Applebee's

 9    restaurants or Applebee's franchise?

10            MR. BERNTSEN:  Object to form.

11            THE WITNESS:  Well, it's not an autocratic

12    organization.
```

**CONFIDENTIAL - FILED UNDER SEAL**

13      BY MR. CLEGG:

14          Q.   Sure.

15          A.   Organization.

16          Q.   Okay.

17              MR. CLEGG:  Well, just one more set of

18      questions just not set but just two more questions

19      and we'll take a break is that okay?  I know --

20              MR. BERNTSEN:  Two more questions yes.

21              MR. CLEGG:  I'll tell you what it sounds

22      like we ought to stop now so -- so that's fine.

23      Let's take a break and go off the record.

24              (A recess was taken.)

25              MR. BERNTSEN:  Before we get started I just

                                                    90

            UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

↟

1          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2      want to confirm on the record under the local rules

3      of district of Utah the stand darted the district

4      standard protective order is in effect until the

5      parties proposed modification and I want to

6      affirmatively designate this deposition as outside

7      counsel attorneys eyes only.  So that's something.

8              MR. CLEGG:  We're going to just so you know

**CONFIDENTIAL - FILED UNDER SEAL**

9      we're going to object to it being attorneys eyes

10     only because in order for my client to be able to

11     make decisions and things like that it's -- they're

12     going to be able to see the deposition and there's

13     nothing that's taking place in this that would

14     require outside counsel only.  So if you want to

15     designate it confidential I think that's fine if you

16     don't we'll just go to court and request that they

17     have it de-designated.

18              MR. BERNTSEN:  For the time being, we're

19     going to designate it "outside counsel attorneys'

20     eyes" only, but we will look at the transcript once

21     we get the rough and confirm whether or not.

22              MR. CLEGG:  Okay.

23              MR. BERNTSEN:  What we will be designating

24     it.

25              MR. CLEGG:  Do you know how soon it will

                                                    91

          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1         UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2      be.

3               MR. BERNTSEN:  How soon we get the rough.

4               MR. CLEGG:  No how soon we get an answer on

5      that because we only have ten days to provide

**CONFIDENTIAL - FILED UNDER SEAL**

6      supplemental briefs so if you want to extend that

7      time out to look at it that's fine but if you wait

8      right until we file supplemental briefs whether it

9      is outside counsel only or not then that puts us in

10     a bit of a cripple, you know.

11         MR. BERNTSEN:  Sure.  Sure.  Let me put it

12     this way.  I haven't had a chance to sit down and

13     talk about schedules with the appropriate people,

14     but I will make every effort to get it to you before

15     the Thanksgiving holiday.

16         MR. CLEGG:  The Thanksgiving holiday?

17         MR. BERNTSEN:  That's Thursday.

18         MR. CLEGG:  But our deadlines are only a

19     few days after that.  That's what I'm saying.  After

20     the Thanksgiving holiday.  That's when briefs are

21     due; right?

22         MR. BERNTSEN:  That's what I can comment at

23     the moment but my hope I will be able to expedite

24     that and if so I will let you know.

25         MR. CLEGG:  Okay.

                                               92

↑

**CONFIDENTIAL - FILED UNDER SEAL**

2      Q.   Okay.  So I guess we're back on the record

3   and Mr. Taylor during the break I have to ask did

4   you discuss any of your questions with any of the

5   testimony here today with your in-house counsel?

6      A.   No.

7      Q.   Okay.  Is it correct -- is it an be

8   accurate description of your prior testimony that

9   Dine Brands does not receive any money directly from

10  franchisees?

11     A.   Yes, that's correct.

12     Q.   Is it correct that Dine Brands does receive

13  money from subsidiaries that would have come from

14  franchisees?

15     A.   I believe that's the accounting process,

16  yes.

17     Q.   Essentially it moves upstream from the

18  franchisee to a subsidiary potentially to another

19  subsidiary and from the IHOP brands subsidiary to

20  Dine Brands?

21     A.   That's how it reads in the annual form,

22  yes.

23     Q.   Okay.  Do you know who selects the officers

24  and directors of the IHOP brand subsidiaries?  Well,

25  let me ask for foundational purposes are there

93

**CONFIDENTIAL - FILED UNDER SEAL**

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

```
 1      UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE
 2   officers and directors of the IHOP subsidiary?
 3        A.   I believe so.
 4        Q.   Do you know who they are?
 5        A.   Jay Johns.
 6        Q.   What are the other ones?
 7        A.   I don't know the other ones.
 8        Q.   Do you know who knows?
 9        A.   It should be -- it should be list in the
10   annual report.
11        Q.   Okay.
12        A.   But --
13        Q.   Do you know who selected Jay Johns -- is he
14   the CEO or the president --
15        A.   President of IHOP.
16        Q.   Okay.  Do know who selected him to be
17   president of IHOP or how he was selected?
18        A.   I believe he was approved by the board.
19        Q.   Board of directors for --
20        A.   For Dine Brands.
21        Q.   So the board of directors for Dine Brands,
22   do they select any of the subsidiaries?
23        A.   I wouldn't know that.
```

**CONFIDENTIAL - FILED UNDER SEAL**

```
24        Q.   But Jay Johns would know that?

25        A.   Yes.
                                                    94


          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE



 1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 2        Q.   And potentially other officers?

 3        A.   Potentially.

 4        Q.   And what about John Cywinski, would he have

 5   been selected by the board of directors for

 6   Applebee's?

 7        A.   I couldn't say.  I don't know.

 8        Q.   Would it be similar to Jay Johns?

 9        A.   You would think in a practical sense it

10   would be.

11        Q.   But you're not --

12        A.   But I don't know the process that he want

13   through.

14        Q.   Okay.  And do you know who would know that

15   who would know the process of that John Cywinski

16   went through to become president of Applebee's?

17        A.   Well, you'll I can't steward was the acting

18   president of Applebee's.

19        Q.   Uh-huh?
```

**CONFIDENTIAL - FILED UNDER SEAL**

20          A.   And I think she was there when he was

21     selected or he came on afterwards.

22          Q.   I see?

23          A.   But I don't know how that process worked.

24          Q.   Now, Julia Stewart was acting president of

25     Applebee's at the time she was CEO of --

                                                              95

          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE


 1          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 2          A.   Right.

 3          Q.   -- Dine Brands?

 4          A.   Dine Equity at the time.

 5          Q.   And when we say "Dine Brands," that's just

 6     the new name for Dine Equity?

 7          A.   Yes.

 8          Q.   So the company such as the subsidiaries

 9     such as IHOP Leasing or IHOP properties can they

10     buy, sell or lease property without the approval of

11     somebody employed by Dine Brands?

12          A.   That, I can't answer.

13          Q.   Do you know who would know that?

14          A.   Enable response.

15          Q.   I'm sorry let me have you answer the

16     question?

**CONFIDENTIAL - FILED UNDER SEAL**

```
17        A.    No, I don't really know who wrote do that.

18        Q.    Okay?

19        A.    I would have to look at the corporate by

20   laws I think to determine their authority.

21        Q.    Approval to buy property, would that --

22   while they may go out and search and find property,

23   the approval, sort of the blessing, on buying that

24   property, would that need to come from a committee?

25        A.    It could potentially, yeah.
                                                  96
```

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

```
1    UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2         Q.    Would it be the review committee or would

3    it be I would it be at headquarters?

4         A.    Yeah.

5              MR. BERNTSEN:   Object to form.

6

7    BY MR. CLEGG:

8         Q.    So that would be at Dine Brands

9    headquarters?

10        A.    Right.

11        Q.    And that would be in Glendale, California?

12        A.    That's correct.
```

**CONFIDENTIAL - FILED UNDER SEAL**

13      Q.   Are you aware of any contracts between Dine

14   Brands and the -- and IHOP Leasing?

15      A.   No.

16      Q.   Are you aware of any contracts between Dine

17   Brands and IHOP properties?

18      A.   No.

19      Q.   So the general control of that would be

20   just on the basis of generally being a subsidiary of

21   Dine Brands?

22           MR. BERNTSEN:  Object to form.

23           THE WITNESS:  Could you restate that.

24   BY MR. CLEGG:

25      Q.   Yeah the relationship between Dine Brands

                                                    97


        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

↟


1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2    and IHOP Leasing or IHOP properties the -- the

3    general relationship between them governing how they

4    do business about is that just the general

5    subsidiary type relationship?

6       A.   As I understand it, yes.

7       Q.   So no need for a written contract just a

8    subsidiary?

9       A.   Just subsidiary.

**CONFIDENTIAL - FILED UNDER SEAL**

10          Q.   Okay.  So basically just subjected to doing

11     things based on what Dine Brands tells them to do?

12               MR. BERNTSEN:  Object.

13     BY MR. CLEGG:

14          Q.   As the party company?

15               MR. BERNTSEN:  Object to form.

16               THE WITNESS:  No, I don't think it's as

17     simple as that.  I think the brands make decisions

18     within the brand.

19     BY MR. CLEGG:

20          Q.   Okay.  Are -- so IHOP LL -- so IHOP brands

21     the mainly IHOP brands?

22          A.   Right.

23          Q.   That has the agreement with the franchisees

24     is there a written -- are the written agreements

25     between that IHOP brands subsidiary and Dine Brands?
                                                    98


          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE



 1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 2          A.   No.

 3          Q.   No.  So that's again just the subsidiary

 4     relationship that governs that relationship?

 5          A.   That's my presumption yes.

**CONFIDENTIAL - FILED UNDER SEAL**

6          Q.    Okay.

7                MR. CLEGG:  Okay.  So I've got actually a

8    couple more exhibits.  Sorry mat more papers for

9    you.  But these will be I believe the last of them.

10   What number are we on?

11               THE REPORTER:  14.

12               MR. CLEGG:  So this will be 14, 15 and 16.

13               MR. CLEGG:  So Exhibit 14 is from the IHOP

14   Website showing the address and location of the IHOP

15   Riverdale, Utah location, the property there in --

16   the franchise -- the IHOP franchise that is located

17   in Riverdale, Utah.

18               (Exhibit 14 was marked for

19                identification by the reporter.)

20               MR. CLEGG:  And Exhibit 15 is a printout

21   from   Weber County Parcel Service, so this is

22   basically the property tax from Weber County which

23   is where Riverdale, Utah is located.

24               (Exhibit 15 was marked for

25                identification by the reporter.)

                                                      99


          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

↑


1    UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2                MR. BERNTSEN:  And for clarification,

**CONFIDENTIAL - FILED UNDER SEAL**

```
 3        Exhibits 14 and 15 have highlighting added to the

 4        printout, I think.

 5               MR. CLEGG:  Yes.  The highlighting is our

 6        highlighting.  Thank you, Matt.

 7               And then Exhibit 16 -- let me make sure.

 8        Exhibit 16 is our tax record payments for that

 9        parcel.  Also from the Weber County Website?

10               (Exhibit 16 was marked for

11                identification by the reporter.)

12               MR. BERNTSEN:  And, again, there is

13        highlight on that; is that correct?

14               MR. CLEGG:  Yes.

15        Q.    Okay.  So basically if you look at

16        Exhibit 14 you'll see that there's an address here

17        of the Riverdale IHOP, -- Riverdale, Utah IHOP.  If

18        you look at Exhibit 15 it shows the ownership of the

19        IHOP is IHOP Property, LLC which you indicated was

20        one of the subsidiaries that owns the property in

21        Utah?

22        A.    Correct.

23        Q.    Is that correct?

24        A.    Correct.

25        Q.    Okay.  So would you agree then that IHOP
```

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

**CONFIDENTIAL - FILED UNDER SEAL**

```
 1      UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE
 2   properties LLC owns the property here at Riverdale,
 3   Utah?
 4           MR. BERNTSEN:  Objection; foundation.
 5           MR. CLEGG:  Well, the foundations the
 6   document is right here you can see.
 7           THE WITNESS:  According to this document,
 8   yes.
 9   BY MR. CLEGG:
10      Q.   Okay.  All right.  So let's look at
11   Exhibit 16 which shows the tax records and tax
12   payments for the property located in Riverdale, Utah
13   that is owned by IHOP Property, LLC.  If you look at
14   the backside of this document, you'll see that in
15   January of 2011 it appears that IHOP Ogden, LLC paid
16   the taxes.  Do you know who IHOP, LLC is?
17      A.   No, I don't.
18           MR. BERNTSEN:  Objection; misstates the
19   document.
20           MR. CLEGG:  Am I misstating it?
21           MR. BERNTSEN:  You missed Ogden.
22           MR. CLEGG:  Did I not say "Ogden"?
23           MR. BERNTSEN:  No.
```

**CONFIDENTIAL - FILED UNDER SEAL**

24    BY MR. CLEGG:

25        Q.   IHOP Ogden, LLC.  I apologize.

                                      101

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1      UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2        A.   No, I don't know.

3        Q.   So in 2009, 2012 and 2014 based on

4    Exhibit 16, it appears the taxes were paid by IHOP

5    Real Estate, LLC.  Does that company still exist?

6        A.   I can't say for sure.

7        Q.   Is there a reason why one company might pay

8    the report tax of another company?

9        A.   What --

10       Q.   Among the subsidiaries?

11       A.   I don't see any issue with it.  I don't

12    know.

13       Q.   I'm just asking the question is -- well,

14    let me ask you is it common for -- within the brand

15    subsidiaries that that group of subsidiaries for

16    IHOP is it unusual for one subsidiary to pay the

17    taxes for the property taxes for another subsidiary?

18       A.   I can't answer that.

19       Q.   Has it happened?

20       A.   According to the record it has.

**CONFIDENTIAL - FILED UNDER SEAL**

```
21        Q.    Okay.  How about Dine Brands does Dine

22    Brands does it ever pay the property taxes for any

23    of the taxes for the subsidiary?

24              MR. BERNTSEN:  Object to form.

25              THE WITNESS:  I can't answer that I'm not
                                                      102


          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE



 1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 2    from the tax department.

 3    BY MR. CLEGG:

 4        Q.    Okay.  And do you know what IHOP I think I

 5    asked this question but just to confirm as I

 6    mentioned in 2011 IHOP Ogden, LLC appear to see have

 7    paid the taxes for IHOP Property, LLC.  Do you know

 8    who IHOP Ogden, LLC is?

 9        A.    No I said earlier.

10        Q.    Yeah?

11        A.    I can't.

12        Q.    And you don't know if they still exist?

13        A.    No I can't.

14        Q.    And is there a reason why a subsidiary

15    might not be listed on the annual report?

16              MR. BERNTSEN:  Objection.
```

**CONFIDENTIAL - FILED UNDER SEAL**

17          THE WITNESS:  I wouldn't see why.

18     BY MR. CLEGG:

19          Q.   Okay.  If they don't appear -- IHOP, LLC

20     doesn't appear to be listed on the annual report I

21     just want to know if you know why?

22          A.   It was prior to my time at Dine Brands.

23          Q.   Okay?

24          A.   So I couldn't answer that.

25          Q.   So in 20123 according to this document

                                                        103


              UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE



1          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2     Exhibit 16 in 2013, 2015 and 2016 it appears that

3     Peak Restaurant Partners paid the taxes.  And so why

4     do you think that Peak -- Peak alternated with IHOP

5     Real Estate all the 2012, 2013, 2014 and 2015 in

6     paying the taxes?

7          MR. BERNTSEN:  Object to form.

8          THE WITNESS:  I can't answer that.

9     BY MR. CLEGG:

10          Q.   Okay.  You don't know the answer?

11          A.   No, I don't.

12          Q.   Do you know were the taxes were paid by

13     IHOP properties LLC in 2016?

**CONFIDENTIAL - FILED UNDER SEAL**

14          A.   No, I don't.

15               MR. BERNTSEN:   Objections it

16     mischaracterizes the document.

17     BY MR. CLEGG:

18          Q.   In 2016 doesn't it say that IHOP Property,

19     LLC paid the taxes?

20          A.   That's what's indicated on here.

21          Q.   Okay.   Do you know who is going inform pay

22     the taxes for this property in 2019?

23          A.   I had no understanding of that.

24          Q.   Okay.   Do you know who would know that?

25          A.   Probably the tax department.

                                                          104

          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2          Q.   Is the tax department is that at Dine

3      Brands corporate?

4          A.   Yes.

5          Q.   Whose over the tax department at Dine

6      Brands corporate?

7               MR. BERNTSEN:   Object to form.

8               THE WITNESS:   Thomas Song.

9      BY MR. CLEGG:

**CONFIDENTIAL - FILED UNDER SEAL**

```
10        Q.    Thomas Song?

11        A.    Uh-huh.

12        Q.    CFO?

13        A.    Nodding head.

14        Q.    Okay.  Do the franchise agreement say

15   anything about tax payments?

16        A.    It's addressed in the franchise agreement

17   but I can't specifically repeat it or understand.

18        Q.    You don't know the terms?

19        A.    No.

20        Q.    And you don't know why franchisees I'm pay

21   tax and you don't know why it's paid by the Dine

22   Brands subsidiaries?
```

███    ███  ████████████    ██████████████

███  █████████████████████████████████

███  ████████████████████████

                                                          105


UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

```
1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2         Q.    And that's a fund where money goes into

3    that from a different subsidiaries plus franchises?

4         A.    I don't know if it goes into a different

5    subsidiary.  I mean --

6         Q.    Well, who -- who puts money into that fund?
```

**CONFIDENTIAL - FILED UNDER SEAL**

```
 7          A.   Franchisees.

 8          Q.   Does anybody put money into it?

 9          A.   I can't answer in a.  I don't know.

10          Q.   Well, would any of the subsidiaries put

11     money into it?

12          A.   Potentially.

13          Q.   But you don't know?

14          A.   But I don't know.

15          Q.   And what about Dine Brands would they put

16     any money into that?

17          A.   Not on -- I don't know if they do.

18          Q.   Do you know who would know would that be

19     Thomas Song?

20          A.   It notice.  It might be.

21          Q.   But you don't know?

22          A.   I don't know.

23          Q.   Okay.

24          A.   It's a brands level type of issue.

25          Q.   What about the IHOP apps who advertises
                                                        106
```

```
          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE
```

```
 1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 2     those?
```

**CONFIDENTIAL - FILED UNDER SEAL**

```
3          A.    Who?  I don't know who advertises those.

4          Q.    Well, for example, who selects

5     advertisements that go on the outside of buildings

6     at franchise locations is that an and a half

7     decision?

8          A.    That would be a local decision.

9          Q.    Okay?

10         A.    If you're talking effect specifically of

11    putting something on your building.

12         Q.    What about -- what about the menus who --

13    who creates the menus is that done by franchisees or

14    is there a menu that -- do the franchisees buy a

15    menu from the brand?  For example if you go into

16    different IHOP restaurants the menus all look the

17    same correct; is that correct?

18         A.    I don't know.  I don't go into IHOP.

19         Q.    Who makes the decision as to what goes on

20    the menu?

21         A.    There is a menu committee made up of

22    franchisees and IHOP brand and Applebee's brand.  It

23    takes into consideration marketing and consumer

24    insights, business analytics.

25         Q.    So it's -- it's a committee that includes
```
107

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

**CONFIDENTIAL - FILED UNDER SEAL**

```
 1      UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 2      franchisees and I assume wouldn't there be people

 3      from Dine Brands on that committee?

 4          A.   It would be the marketing and the --

 5          Q.   The marketing from Dine Brands?

 6          A.   No from IHOP.

 7          Q.   From IHOP.  Okay.

 8          A.   Okay.  Remember Dine Brands is a corporate.

 9          Q.   Sure?

10          A.   Brand decisions are made within the brand.

11          Q.   Are any -- is anybody in corporate in a

12      position to make Decembers or executive decisions as

13      to what depose on the menu what doesn't go on the

14      menu not that they would but could they?

15          A.   On the Dine Brands level?

16          Q.   Yeah.  Well, no -- well, yeah on the Dine

17      Brands level?

18          A.   No.

19          Q.   Just the CEO you don't know?

20          A.   I don't know that question.

21          Q.   Okay.  Okay.  The -- but the menus

22      themselves do they receive like -- well, the menus

23      are they provided by IHOP or are they provided by

24      Dine Brands or are they provided by --
```

**CONFIDENTIAL - FILED UNDER SEAL**

```
25          A.    They are provided by a vendor engaged by
                                                       108


             UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE



 1          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 2     the brands to produce the menu in conjunction.

 3          Q.    I see.

 4          A.    With what the menu committee has decided

 5     to --

 6          Q.    I see.  When you say the are IHOP and the

 7     would pay a vendor to the and provided to the

 8     franchisees?

 9          A.    I think the franchisees actually access the

10     vendor for the menus.

11          Q.    So the franchisee buys them from the

12     vendor?

13          A.    Yes.

14          Q.    But the vendor gets the information from

15     IHOP?

16          A.    Correct.

17          Q.    Okay.  All right.  So IHOP directs,

18     essentially, what the menus lok like so the

19     franchisees could go to the third-party vendor and

20     buy it; is that right?
```

**CONFIDENTIAL - FILED UNDER SEAL**

21        A.    IHOP and the committee decide what the menu

22   should look like --

23        Q.    I see.

24        A.    -- on the product and then they go to the

25   vendor.

                                                            109


              UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1             UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2        Q.    So any billboards -- well, let me back

3    up -- strike that.

4             Any -- so it sounds like there are two

5    categories of advertising from the standpoint of who

6    makes decisions; is that correct?  That's the local

7    decision and those are franchisees locally and then

8    there's sort of national decisions and that's the

9    committee.  Or is it different from that?

10        A.    There's an advertising committee as well.

11        Q.    There's an advertising committee?

12        A.    There's a lot of committees.

13        Q.    Is that different from the market

14   committee?

15        A.    Yes.

16        Q.    And the advertising committee is also a mix

17   of the brand subsidiaries the franchisees and Dine

**CONFIDENTIAL - FILED UNDER SEAL**

```
18    Brands?
19        A.    Not Dine Brands.  I -- IHOP marketing IHOP
20    advertising.
21        Q.    Uh-huh?
22        A.    Sinks they're fairly related in what the
23    menu should be.
24        Q.    Okay?
25        A.    They should be part of that committee with
                                                      110
```

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

```
 1     UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE
 2    the franchisees.
 3        Q.    Okay.
 4        A.    And they would decide based upon business
 5    analytics on what -- how to advertise where to
 6    advertise nationwide.
 7        Q.    Are franchisees allowed to do any local
 8    advertising without consulting IHOP brands?
 9        A.    They -- few newer franchisees will consult
10    with us about local advertising.  But given the
11    existence of the brand for so many years a lot -- a
12    lot can just go ahead and advertise without fog --
13        Q.    Meaning there are some franchisees that can
```

**CONFIDENTIAL - FILED UNDER SEAL**

14  because of the long years of press they can go ahead

15  and do local advertising?

16    A. Okay.

17    Q. But there's a lot of newer ones they need

18  to have more input from brands?

19    A. Don't --

20    Q. Is that -- I'm just trying to get clarity

21  you can restate it in the way you think it's

22  correct.  That's -- I'm just trying to get an

23  understanding of how this works?

24    A. They don't.

25     MR. BERNTSEN:  Object to form.

                   111

    UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1   UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2     THE WITNESS:  They don't need to come to

3  us.

4  BY MR. CLEGG:

5    Q. Okay.

6    A. But a lot of the newer franchisees --

7    Q. Okay.

8    A. -- up when you're opening.

9    Q. Right.

10    A. A new store will come to us and ask us

CONFIDENTIAL - FILED UNDER SEAL

11    about different aspects --

12        Q.    Okay.

13        A.    -- doing local advertising whether it's

14    coupon or point of sale.

15        Q.    And those don't have to be approved by

16    brands?

17        A.    They'll look at it and say fine.

18        Q.    So there's an approval process if there was

19    something offensive on it you wouldn't approve it?

20        A.    If there was something offensive, I would

21    hope they wouldn't approve it.

22        Q.    And if they did something that was

23    offensive that could potentially cause damage to the

24    brand?

25        A.    Correct.

                                              112

        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2        Q.    Could something like that lead to them

3    losing their franchise?

4            MR. BERNTSEN:  Object to form.

5            THE WITNESS:  I wouldn't say it is -- we

6    don't --

**CONFIDENTIAL - FILED UNDER SEAL**

```
 7    BY MR. CLEGG:
 8        Q.   It many not saying you do, but the question
 9    could you would Dine Brands or would IHOP subsidiary
10    have the power to say that's too much we're
11    terminating your license?
12        A.   As a hypothetical, I can't answer.
13        Q.   Well, it's not hypothetical.  The question
14    is whether that power is in the agreement to do so.
15        A.   Within the agreement I believe it's stated
16    that way that there are certain brand standards they
17    have to keep.
18        Q.   Okay.  And if IHOP brands allowed something
19    to happen that was offensive that Dine Brands
20    disagreed with could Dine Brands intervene and say
21    no we're going to -- we're not going to approve
22    that?
23        A.   Not in my experience.  I don't know of any
24    incidents where that had occurred.
25        Q.   But they had the power to do so if they
                                                    113
```

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

```
 1    UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE
 2    wanted to?
 3        A.   It's a corporate structure and dictated by
```

**CONFIDENTIAL - FILED UNDER SEAL**

4      corporate agreement and we're just looking for those

5      terms and conditions.

6          Q.   Okay.  So you indicate that had the signage

7      on these doors are not provided by the subsidiaries

8      like on the franchise like IHOP sign all of that is

9      provided by the franchisee?

10          MR. BERNTSEN:  Object to form.

11          THE WITNESS:  The -- the design of the

12     logo.

13     BY MR. CLEGG:

14          Q.   Right.

15          A.   You mean.

16          Q.   Well, for --

17          A.   I can't he.

18          Q.   Well, let me go back and clarify what I'm

19     asking.  Is there like third party vendors that make

20     all the stuff that gets used by the franchisees

21     because if you go to a store of course you'll see

22     they're fairly uniform right to keep that you any

23     format do the IHOP subsidiaries implement the third

24     party vendors that they use to provide stuff to the

25     franchisees?

                                                   114

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

**CONFIDENTIAL - FILED UNDER SEAL**

```
1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2        A.    They do.

3        Q.    Okay.  Would that be for signage?

4        A.    I can't answer that specifically.

5        Q.    Do you know who would know that?
```



**CONFIDENTIAL - FILED UNDER SEAL**

115

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

15        Q.    Check could Dine Brands terminate a

16    franchise agreement if a franchisee refuses to use

17    the menus we discussed before, they want to do their

18    own menu?

19        A.    I believe within the franchise agreement

20    they can.

21        Q.    And if anybody doesn't want to use the

**CONFIDENTIAL - FILED UNDER SEAL**

22    signage from the co-ops they wanted some other color

23    they wanted to do could you terminate it if they

24    refused to use your signage?

25              MR. BERNTSEN:  Object to form.

                                                        116


              UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE


1              UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2              THE WITNESS:  That would be at the

3    discretion of the IHOP brand committee you no know

4    or review committee.

5              MR. CLEGG:

6         Q.   Are there certain advertising material

7    that's the IHOP brand subsidiaries require that of

8    the franchisees that they have to use?

9              MR. BERNTSEN:  Object.

10             THE WITNESS:  Not to my knowledge.

11             MR. CLEGG:  Why don't we take about in its

12   okay about a 5 or 10 minutes break and I think we

13   might be wrapped up.

14             MR. BERNTSEN:  Sure.

15             MR. CLEGG:  Okay.  Off the record.

16             (A recess was taken.)

17             MR. CLEGG:  Back on the record.

**CONFIDENTIAL - FILED UNDER SEAL**

18          MR. BERNTSEN:  Please.

19          MR. CLEGG:  Okay.  Great for the record I

20     just want to make sure we get our objections in as

21     to we're objecting because we don't think you had a

22     properly or you didn't have designated witness.  It

23     was properly or fully prepared on all the topics

24     this we're permitted by the court and we'll have

25     disagreements as to that whether we think we'll need

                                             117


          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE


 1     UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

 2     additional testimony or not, we'll have to review

 3     the transcript and of course I expect you to object

 4     whatever that might be.  I also want to address -- I

 5     want to get back to addressing the issue with the

 6     aspect of confidentiality my concern is that if

 7     you're going to I think we just out to get our meet

 8     and confer if you want to designate it outside

 9     counsel only and-be told until the He would of next

10     week we'll have almost no time whatsoever to deal

11     with this before we have to do our briefing so we

12     with can handle that in an um couple of ways one way

13     we could handle it as sort of a compromise we say we

14     agree to extent when we do the briefing from

**CONFIDENTIAL - FILED UNDER SEAL**

```
15    wherever it is either we get an answer from you that

16    says okay maybe it's confidential but it's not

17    outside counsel only or if it's outside counsel only

18    and we'd object to it and where he file a motion and

19    we get a decision from the court and we get so many

20    days from that time period.  Or if that's not

21    acceptable we could simply, you know, file a short

22    form discovery motion to address it.  So I don't

23    know if you -- you know, what your thoughts are on

24    that, how you want it handle that.  We're open to

25    either of those options but we certainly have to get
                                                        118
```

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

```
1     UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2     time to know before our briefing is due on whether

3     we're going to have access you know what I can show

4     the complaint the transcript.

5            MR. BERNTSEN:  I'm just standing up to put

6     the blinds down.  It's hitting me in the face when

7     it bounces off the table.

8            MR. CLEGG:  We can do that.

9            MR. BERNTSEN:  Why don't we see if we can

10    get back to you as early as Monday.
```

**CONFIDENTIAL - FILED UNDER SEAL**

11          MR. CLEGG:  Okay.

12          MR. BERNTSEN:  Hopefully, we can put this

13     thing to the side.  One thing that may expedite that

14     process is knowing who the universe of people within

15     MFA are that would potentially receive access if the

16     transcript were to be designated merely

17     confidential.

18          MR. CLEGG:  If you designated merely --

19     okay.  So do you remember we had -- there was a

20     separate case where we agreed on a protective order.

21     And in that protective order we agreed that we would

22     allow in-house counsel to look at documents provided

23     they signed --

24          MR. BERNTSEN:  I recall there's some

25     procedure --

                                                     119


          UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

✦



1     UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2          MR. CLEGG:  -- the gist of it.  We would

3     limit it to Andrew.

4          MR. BERNTSEN:  Okay.

5          MR. CLEGG:  And nobody else within the

6     company --

7          MR. BERNTSEN:  Okay.

**CONFIDENTIAL - FILED UNDER SEAL**

8          MR. CLEGG:  -- that if you felt if needed

9     to be designated attorneys' eyes only.

10         MR. BERNTSEN:  Okay.

11         MR. CLEGG:  Fair enough.

12         MR. BERNTSEN:  That will help me in having

13    a dialogue.  So let me endeavor to get back to

14    you --

15         MR. CLEGG:  Yeah.

16         MR. BERNTSEN:  -- by Monday.

17         MR. CLEGG:  And keep in mind that we're not

18    a competitor.  "We" as in the client, but, you know,

19    the Modern Font Applications is not a competitor.

20    There's nothing that took place here during this --

21    there's no information here that relates to any

22    future patent prosecution.  There's nothing here

23    that relates to competitive attorney information.

24    There's nothing in here.  You know what I'm saying?

25         MR. BERNTSEN:  No.  I hear you loud and

                                              120


              UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

↟


1      UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2     clear.  It's just I need to have a dialogue with my

3     client --

**CONFIDENTIAL - FILED UNDER SEAL**

```
 4              MR. CLEGG:  Sure.

 5              MR. BERNTSEN:  -- which I haven't had

 6      because I need to work with them to assess --

 7              MR. CLEGG:  Yeah.

 8              MR. BERNTSEN:  -- how central to their core

 9      business --

10              MR. CLEGG:  Fair enough.

11              MR. BERNTSEN:  -- the information that we

12      talked about today.

13              MR. CLEGG:  Keeping that in mind, we still

14      may need, you know, a few extra day's review delay.

15      So -- these are things -- I work closely with your

16      in-house counsel on these things, so --

17              MR. BERNTSEN:  Can't say one way or the

18      other what will happen but I try not to hold

19      people's feet to the fire where possible.

20              MR. CLEGG:  Okay.  I don't think we have

21      any further questions of the witness.

22              MR. BERNTSEN:  I will have a few on

23      redirect if I may.

24                              ***

25                      FURTHER EXAMINATION
                                                         121
```

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

**CONFIDENTIAL - FILED UNDER SEAL**

```
 1        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE
 2   BY MR. BERNTSEN:
 3        Q.   So I think earlier there's discussion about
 4   Dine Brands and franchisees and franchise agreement
 5   and the subsidiary brands and I just want to be
 6   clear.
 7             Does Dine Brands enter into franchise
 8   agreements?
 9        A.   No.
10        Q.   And I just want to talk briefly about the
11   management structure of Dine Brands down into the
12   IHOP and Applebee's channels.  At the top I assume
13   there's a board of directors; is that correct?
14        A.   That's correct.
15        Q.   And what that below the poured of
16   directors?
17        A.   Well, there's a board of director and then
18   below that are the subsidiaries right.
19        Q.   Okay.  Is there an executive committee
20   within Dine Brands?
21        A.   Yes.
22        Q.   Does that report to the board of directors?
23        A.   Yes.  It would.
24        Q.   And is there some interaction between the
25   executive committee at Dine Brands and IHOP?
```

**CONFIDENTIAL - FILED UNDER SEAL**

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

```
 1      UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE
 2      A.    They're a separate executive teams for the
 3   brands.
 4      Q.    So IHOP has a separate executive team?
 5      A.    Yes.
 6      Q.    And is the same true for Applebee's?
 7      A.    True, yeah.
 8      Q.    And who makes decisions as to the
 9   day-to-day operations of IHOP?
10      A.    The brands IHOP.
11      Q.    And make decisions the with respect to the
12   day to day decision of Applebee's?
13      A.    Applebee's brand.
14      Q.    Okay.
15      MR. BERNTSEN:  We could go off the record I
16   want to have a brief conversation with co-counsel
17   here we can -- I want do make sure I'm done on
18   redirect.
19      MR. CLEGG:  Oh, you're not sure if you're
20   done.
21      MR. BERNTSEN:  Yes.
```

**CONFIDENTIAL - FILED UNDER SEAL**

22            MR. CLEGG:  Okay.

23            (A recess was taken.)

24            MR. BERNTSEN:  Nothing further on redirect.

25            MR. CLEGG:  I do have a couple questions in

                                                    123

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1      UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2      view of what you said.

3         Q.    So you indicated that there's an executive

4      committee for IHOP and a separate executive

5      committee for Dine Brands and they both report --

6      they both report to the board of directors of Dine

7      Brands?

8         A.    There's an executive leadership team --

9         Q.    Okay.

10         A.    -- which I call executive management team.

11         Q.    Are they executives, then, that make up

12      that executive leadership team?

13         A.    Yes.

14         Q.    They're officers?

15         A.    I don't know if they're in officers in the

16      sense of that.

17         Q.    Okay.  But you called them executives?

18         A.    We call it executive leadership team, yeah.

**CONFIDENTIAL - FILED UNDER SEAL**

19      Q.    And there's one for the IHOP brand

20    subsidiary and one for the Dine Brands?

21      A.    Yes.

22      Q.    And they both report to the board of

23    directors?

24      A.    No they would report up to Dine Brands.

25      Q.    They would both report to Dine Brands?

                                                    124

        UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

1       UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2       A.    Yes.

3       Q.    Management I see.  Does people on the

4     executive team of IHOP also on the executive team of

5     Dine Brands?

6       A.    I would think the presidents are executive

7     team.

8       Q.    Who would those presidents be?

9       A.    Jay Johns and Cywinski.

10      Q.    Are presidents of the executive team of

11    IHOP and Applebee's?

12      A.    Yeah.

13      Q.    And they're also on the executive team at

14    Dine Brands?

**CONFIDENTIAL - FILED UNDER SEAL**

15      A.   Yes.

16      Q.   I see and they both report to Dine Brands?

17      A.   Correct.

18      Q.   Okay.

19           MR. CLEGG:  That's it.

20           MR. BERNTSEN:  Off the record.

21           MR. CLEGG:  Off the record.

22           MR. BERNTSEN:  Actually you wanted orders.

23   Your deposition so why don't you go first.

24           MR. CLEGG:  For us we just want the rough

25   transcript today.  Eventually, we would want the

                                                   125


           UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE



1       UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE

2    formal one, but the formal one expedited is much

3    more expedited than the ones not expedited, and

4    we'll get the rough one today and the formal one

5    when it is ready.

6            MR. BERNTSEN:  Same for us.  Thank you.

7    And to be clear, that's the same day or next day

8    rough.

9

10

11

**CONFIDENTIAL - FILED UNDER SEAL**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

126

UNCERTIFIED ROUGH DRAFT -- NOT FOR OFFICIAL USE