**EXHIBIT 1**

Perry Clegg (USB 7831)
    pclegg@kba.law
**KUNZLER BEAN & ADAMSON, PC**
50 W. Broadway, Suite 1000
Salt Lake City, UT 84101
Tel.: (801) 994-4646
Fax: (801) 531-1929

*Attorneys for Plaintiff,*
Modern Font Applications LLC

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| MODERN FONT APPLICATIONS LLC, a Utah limited liability company,<br><br>    Plaintiff,<br><br>v.<br><br>PEAK RESTAURANT PARTNERS, LLC; a Delaware limited liability company; DINE BRANDS GLOBAL, INC., a Delaware corporation; and DOES 1-5,<br><br>    Defendant(s). | Case No. 2:19-cv-00221-TS-DBP<br><br>**AMENDED COMPLAINT FOR PATENT INFRINGEMENT AND JURY DEMAND**<br><br>District Judge Ted Stewart<br>Magistrate Judge Dustin B. Pead |

Plaintiff Modern Font Applications LLC ("MFA" or "Plaintiff"), for its amended complaint against Defendants Peak Restaurant Partners, LLC ("Peak"), Dine Brands Global, Inc. ("Dine Brands"), and DOES 1-5 ("DOES") (collectively "Defendants") alleges as follows:

## INTRODUCTION

1. MFA instituted the present action against Defendants for infringement of United States Patent No. 9,886,421 ("the '421 patent" or "patent in suit"), entitled "Allowing Operating System Access to Non-Standard Fonts in a Network Document" to prevent the unfair and

unlawful exploitation of its intellectual property. A copy of the '421 patent is attached hereto as **Exhibit A**. The disclosure of the '421 patent is incorporated herein by reference. MFA seeks an injunction against Defendant's unlawful conduct, as well as an award of damages and attorneys' fees as provided by law.

2. The patent in suit discloses apparatuses and methods for delivery and rendering of non-standard or external fonts within a network system.

3. Robert G. Adamson, III is the inventor of the patent in suit.

4. Mr. Adamson has been a computer scientist since at least 1971. In 1981, Mr. Adamson founded Software Generation Technology Corp. and wrote one of the first fully interpretive languages for IBM mainframe computers.

5. Mr. Adamson later founded Nostradamus Inc. and wrote Instant Replay, one of the first multimedia tools for personal computers. This tool was used by thousands of large companies, including Intel, Microsoft, and Novel. Mr. Adamson also wrote utilities including Noblink and Hardrunner, both of which received Editor's Choice awards from PC Magazine.

6. Mr. Adamson later wrote MediaForge, one of the first multimedia authoring tools for the Windows operating system. MediaForge was sold to Strata and was a "Best of Comdex" finalist in development software in 1994. Over 50 million MediaForge runtimes were distributed.

7. Mr. Adamson has been an active developer of application authoring technology since the 1990s.

8. In 2001, Mr. Adamson founded a technology company to develop software. That company currently offers software development services utilizing font delivery technology.

9. Mr. Adamson later founded a technology company that incorporates font delivery technology with digital photo editing. Mr. Adamson currently works with this company to offer a commercial software development kit (SDK) for authoring digital photo applications including

2

font delivery capabilities.

10. Mr. Adamson's font delivery technologies predate the field of mobile applications for smart phones by several years.  Mr. Adamson filed the priority application for the patent in suit in 2001.

11. Upon information and belief, in 2003, development of the Android operating system began.

12. Upon information and belief, in 2007, the iPhone and iOS were introduced to the public.

13. Upon information and belief, in 2007, the Android operating system was introduced to the public.

14. Upon information and belief, in 2008, the first mobile application stores were opened online.

## THE PARTIES

15. MFA is a Utah limited liability company with its principal place of business in Salt Lake City, Utah. MFA is the exclusive licensee of the patent in suit and continues to hold all substantial rights, including the right to sue for infringement and to collect all damages (including past damages) for infringement of the patent in suit.

16. On information and belief, Defendant Peak is a limited liability company organized and registered in the State of Delaware whose registered agent and address for service of process in Utah is Corporation Service Company, 15 West South Temple STE 1701, Salt Lake City, Utah 84101. On information and belief, Defendant Dine Brands Global, Inc. is a corporation organized and registered in the State of Delaware. On information and belief, Dine Brands was formerly known as DineEquity, Inc.  On information and belief, Dine Brands' registered agent and address for service of process is Corporation Service Company, 2710 Gateway Oaks Drive,

Suite 150N, Sacramento, CA 95833. On information and belief, Defendant Dine Brands, Defendant Peak, and DOES 1-5 operate and/or otherwise do business in Utah as "IHOP."

17. Defendants DOES 1-5, on information and belief, are partners, agents, customers or associates of the other named Defendants, or other parties who participated in the acts of infringement hereafter alleged, who may later be specifically identified as parties herein.

18. On information and belief, Defendant Dine Brands, Defendant Peak, and DOES 1-5 operate one or more regular and established place(s) of business in this state and this judicial district. For example, on information and belief, Defendant Dine Brands, Defendant Peak, and DOES 1-5 operate at least ten (10) places of business in this state and judicial district, including IHOP 3625, 635 E 400 S, Salt Lake City, UT 84102; IHOP, 307 West 2100 S, Salt Lake City, UT 84115; and IHOP, 3383 Decker Lake Dr., West Valley City, UT 84119.

19. Each of Defendant Dine Brands, Defendant Peak, and DOES 1-5 makes, sells, offer for sale, uses, and/or imports one or more products and or systems, including mobile applications, that infringe at least one claim of the patent in suit, as further alleged herein.

20. Upon information and belief, the accused products and systems are used in the state of Utah and in this judicial district by Defendant Dine Brands, Defendant Peak, and DOES 1-5 and/or others induced by Defendant Dine Brands, Defendant Peak and DOES 1-5 to use such products and systems. For example, upon information and belief, employees of Defendants Peak, and one or more of DOES 1-5 use the accused products and systems in the state of Utah. As another example, customers of Defendant Dine Brands, Defendant Peak and one or more of DOES 1-5 use the accused products and systems in the state of Utah. As another example, Defendants Dine Brands, Peak, and one or more of DOES 1-5 direct advertising into the state of Utah that induces customers to infringe the '421 patent through use of the accused products and

systems in the state of Utah.

## JURISDICTION AND VENUE

21. MFA incorporates by reference paragraphs 1 through 20 above.

22. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1331 and 1338(a) because this action arises under the patent laws of the United States of America, i.e., Title 35 of the United States Code.

23. Venue is proper in this judicial district pursuant to 28 U.S.C. §1400(b).

## THE ASSERTED PATENT

24. The '421 patent claims improvements in the field of computer technology, including improvements in technology for the delivery and use of non-standard or external fonts within a network system, as set forth in the '421 patent and further demonstrated in the following paragraphs.

25. At the time that Mr. Adamson filed the priority application in 2001, the claimed elements and claimed combinations in the '421 patent were not well-understood, routine, or conventional to a skilled artisan in the relevant field. The claims of the patent in suit cover patent eligible subject matter, are not directed to an abstract idea, and contain inventive concepts sufficient to transform any abstract idea into a patent-eligible application, as set forth in the '421 patent and further demonstrated in the following paragraphs.

26. As set forth in the '421 patent, "electronic documents requested by a reader are displayed on the reader's computer using only the fonts that are currently loaded on the reader's computer. Accordingly, if the reader's computer does not contain the same fonts that were used by the author in creating the electronic document, the electronic document is displayed on the reader's computer in a form different than that originally created by the author. Generally, the operating

5

system of the reader's computer replaces the unknown fonts with known fonts when displaying the electronic document."

27. As set forth in the '421 patent, "Several attempts have been made to ensure that electronic documents made with non-standard fonts are displayed on a reader's computer in the same form, i.e., same font(s), as created by the author. One commonly used method is to represent the text as images in a digital format, such as bitmaps or jpeg files. These digital images, however, cannot be resized without a loss of quality. For example, if a digital picture of a text character is enlarged, the resolution of the text character is also enlarged, thereby degrading the visual appearance of the character both on the screen and in print."

28. As set forth in the '421 patent, "characters represented as image files are typically much larger than characters represented by fonts. Accordingly, using an image file increases the size of the electronic document, thereby increasing its download time. In addition, image files take longer to display on a screen. Thus, operations such as scrolling that require an image to be frequently rendered are slowed down and otherwise degraded. Finally, characters represented as image files cannot be stylized. For example, such characters cannot be italicized."

29. As set forth in the '421 patent, "In another attempted solution, a first computer includes a document builder that receives input text so that the input text may be represented in the document. The input text is originally defined using pre-defined font descriptions. The document builder then creates a new font description (hereinafter called a "proprietary vector font description") for the input text with the aid of a character shape recorder. The proprietary vector font description is then placed in the document. The first computer system then delivers the document to a second computer system. The second computer system includes a character shape player which is uniquely configured to interpret the proprietary vector font descriptions included in the document. If the second computer system does not already have the character shape

6

player, the character shape player may be downloaded with the document."

30. As set forth in the '421 patent, "the proprietary vector font description is not standard to a reader's operating system. Accordingly, this solution requires the use of the character shape player by every reader's computer that is to display an electronic document containing the proprietary vector font. Many applications may not be configured to access the services of the character shape player. Accordingly, this solution does not allow the fonts represented by the proprietary vector font description to be freely copied and pasted into or otherwise used, such as by printing, by other applications that do not access the services of the character shape player. In addition, even if an application had access to the object player mechanism, the fonts cannot be rendered as efficiently as they could if the operating system itself was capable of interpreting the fonts. Accordingly, operations such as scrolling of the fonts is sluggish."

31. As set forth in the '421 patent, "what are desired are methods, systems, and computer program products for allowing characters of fonts that are not standard to an operating system of a reader's computer to be conveniently used by the operating system to facilitate viewing, copying, pasting, printing, and/or editing of the characters in different applications."

32. As set forth in the '421 patent, "The computer automatically executes the installation software which in turn either permanently installs or temporarily exposes the computer readable formatting information to the operating system so as to enable the operating system to render the characters of the non-standard fonts. As a result, the network document is generated and displayed by the computer using the same characters with which it was originally created."

33. As set forth in the '421 patent, "in one embodiment the installation or exposure of the computer readable formatting information is done in a manner that the operating system of the computer has at least temporary access to utilize the characters of the nonstandard fonts. That is, the operating system is able to use the characters of the nonstandard fonts in the same way that it

uses characters of original standard fonts. The operating system is thus able to efficiently copy, paste, print, modify, and otherwise edit the characters of the non-standard fonts."

34. As set forth in the '421 patent, "one of the problems of the prior art is that an increasing number of electronic documents are being created using unique characters wherein corresponding formatting information is not loaded on or otherwise available to a browsing computer, i.e., non-standard characters. Accordingly, when a browsing computer downloads the electronic document over a network or otherwise receives and opens the electronic document, the electronic document is displayed on the browsing computer without the non-standard characters or by replacing the non-standard characters with other characters that are available to the browsing computer. In any event, the electronic document is displayed in a format different from that intended at its creation."

35. As set forth in the '421 patent, "One of the unique benefits of the present invention is that once font files 312 are enabled on browsing computer 204, the characters within font files 312 can be used the same as any of the font characters originally loaded on browsing computer 204. For example, the characters of font files 312 can be cut, pasted, printed and otherwise handled or manipulated, i.e., underlined, italicized, bolded, etc., just the same as originally loaded font characters. In turn, this increases efficient inter-application functionality. For example, the characters of font files 312 can also be copied and pasted to any other application being control by operating system 505, for example, applications 510a or 510b as depicted in FIG. 6."

36. As set forth in the '421 patent, "the principles of the present invention allow the operating system of a browsing computer access to non-standard characters when the browsing computer either retrieves off of the Internet or otherwise opens a network document or application that uses the non-standard characters. This allows the author of the electronic document or application to feel secure that no matter how unique the characters chosen to convey a message,

the characters will be rendered on the browsing computer as the author intended. In addition, in one embodiment, the operating system can now use the nonstandard characters for copying and pasting across applications, as well as any other editing or printing that is enabled by the operating system, thus enhancing the functionality to the end user."

37. Pursuant to Rule 11(b)(3), upon information and belief, the factual contentions -- that the asserted claims cover improvements in the field of computer technology, are not directed to an abstract idea, and that the claimed elements and claimed combinations in the '421 patent were not well-understood, routine or conventional to a skilled artisan in the relevant field and contain an inventive concept sufficient to transform any abstract idea into a patent-eligible application -- will likely have additional evidentiary support after a reasonable opportunity for further investigation or discovery.

### FIRST CLAIM FOR RELIEF

(Infringement of U.S. Patent No. 9,886,421)
(Against All Defendants)

38. MFA incorporates by reference paragraphs 1 through 37 above.

39. On February 6, 2018, the '421 patent was duly and legally issued for an invention entitled: "Allowing Operating System Access to Non-Standard Fonts in a Network Document."

40. Since at least June 2018, substantially all the licensed patent articles have been marked in accordance with 35 U.S.C. §287, thereby putting all Defendants and the public on notice of the '421 patent.

41. As described more fully in the incorporated disclosure of the '421 patent, the inventions of the '421 patent are improvements over prior art and subsequent patentably distinct means and methods of font delivery, and the '421 patent enables a combination of features not present in the

9

prior art or other non-infringing means and methods.

42. Defendant Dine Brands has directly infringed and continues to directly infringe at least claims 1 and 11, and upon information and belief claim 6, and dependent claims of the '421 patent through making, using, selling, offering for sale, and/or importing of Defendant Dine Brand's products and services including, but not limited to Defendant Dine Brands' IHOP application for iOS devices, including at least version number 2.1.0, released on March 12, 2018 (the "Accused Product(s)").  Upon information and belief, Defendant Peak and DOES 1-5 have directly infringed and continue to directly infringe at least claims 1 and 11, and upon information and belief claim 6, and dependent claims of the '421 patent at least through making, using, and/or importing of Defendant Dine Brand's products and services including, but not limited to the Accused Products.  Pursuant to Rule 11(b)(3), upon information and belief, the factual contentions – regarding the actions of Defendant Peak and DOES 1-5 -- will likely have additional evidentiary support after a reasonable opportunity for further investigation or discovery.

43. Defendant Dine Brands provides the Accused Product(s) via a storage device attached to a computer, which is a non-transitory computer-readable medium adapted for use with a computer.  Within the storage device, Defendant Dine Brands provides the iOS application in a computer-readable file. Upon information and belief, Defendant Peak and DOES 1-5 use the Accused Product(s) via a storage device attached to a computer, which is a non-transitory computer-readable medium adapted for use with a computer.  Upon information and belief, within the storage device, Defendant Peak and DOES 1-5 use the iOS application in a computer-readable file. Pursuant to Rule 11(b)(3), upon information and belief, the factual contentions – regarding the actions of Defendant Peak and DOES 1-5 -- will likely have additional evidentiary

support after a reasonable opportunity for further investigation or discovery.

    44. Defendants' Accused Product(s) provide an electronic file package including a plurality of display characters and computer executable instructions for identifying the plurality of display characters for display and for identifying one or more external fonts used to render at least one of the plurality of display characters.  Within the iOS application file, Defendant Dine Brands provides at least one file package, for example, the executable file in a directory within the /Payload/ directory.  Defendant Dine Brands also provides .nib files and .strings files.  These files include (a) characters to be displayed when the iOS application is used, (b) computer executable instructions for identifying characters to be displayed, and (c) computer executable instructions for identifying external fonts used to render the characters. Upon information and belief, within the iOS application file, Defendant Peak and DOES 1-5 uses at least one file package, for example, the executable file in a directory within the /Payload/ directory.  Upon information and belief, Defendant Peak and DOES 1-5 also use .nib files and .strings files. Pursuant to Rule 11(b)(3), upon information and belief, the factual contentions – regarding the actions of Defendant Peak and DOES 1-5 -- will likely have additional evidentiary support after a reasonable opportunity for further investigation or discovery.

    45. Defendant Dine Brands' Accused Product(s) provide a font package comprising one or more external font files that include formatting information necessary for the hand-held device to render the at least one of the plurality of display characters using the one or more identified external fonts.   Within the iOS application file, Defendant Dine Brands provides font packages in a subdirectory of the /Payload/ directory.  Each of the font packages comprises an external font file. Upon information and belief, Defendants Peak and DOES 1-5, through the Accused Product(s), use a font package comprising one or more external font files that include formatting information necessary for the hand-held device to render the at least one of the plurality of

11

display characters using the one or more identified external fonts. Upon information and belief, within the iOS application file, Defendants Peak and DOES 1-5 use font packages in a subdirectory of the /Payload/ directory. Pursuant to Rule 11(b)(3), upon information and belief, the factual contentions – regarding the actions of Defendant Peak and DOES 1-5 -- will likely have additional evidentiary support after a reasonable opportunity for further investigation or discovery.

46. Defendant Dine Brands' Accused Product(s) provide the font package separate from the computer executable instructions for identifying the plurality of display characters for display. Upon information and belief, Defendants Peak and DOES 1-5, through the Accused Product(s), use the font package separate from the computer executable instructions for identifying the plurality of display characters for display. Within the iOS application file, the font package includes a .ttf file and a .otf file, whereas the computer executable instructions are in an executable file without any extension or in the .nib or .strings files. They are separate files. Pursuant to Rule 11(b)(3), upon information and belief, the factual contentions – regarding the actions of Defendant Peak and DOES 1-5 -- will likely have additional evidentiary support after a reasonable opportunity for further investigation or discovery.

47. Defendant Dine Brands' Accused Product(s) provide an exposure module for installation of the one or more external font files in a temporary fonts directory on the hand-held device. Upon information and belief, Defendants Peak and DOES 1-5, through the Accused Product(s), use an exposure module for installation of the one or more external font files in a temporary fonts directory on the hand-held device. In the iOS application, the exposure module is a file with a .ipa extension that contains the /Payload/ directory and at least one sub-directory. The temporary fonts directory is a sub-directory of the /Payload/ directory, which is deleted whenever the iOS application is updated or whenever the iOS application is removed from a device. The

.ipa file ensures that the external font files are placed in the proper temporary fonts directory when installed on a handheld device. Pursuant to Rule 11(b)(3), upon information and belief, the factual contentions – regarding the actions of Defendant Peak and DOES 1-5 -- will likely have additional evidentiary support after a reasonable opportunity for further investigation or discovery.

48. Defendant Dine Brands' Accused Product(s) provide the one or more external font files being received from the computer responsive to the computer receiving a request for the font package from the hand-held device so that the hand-held device can render the at least one of the plurality of display characters using the one or more external font files. Upon information and belief, Defendants Peak and DOES 1-5, through the Accused Product(s), use the one or more external font files being received from the computer responsive to the computer receiving a request for the font package from the hand-held device so that the hand-held device can render the at least one of the plurality of display characters using the one or more external font files. For the Accused Product(s), the external font files identified above are received from an application store server (e.g., the Google Play store or iTunes store servers) responsive to that server receiving a request for the font package and the remainder of the application. That request is sent by the handheld device. The request is sent so that the handheld device can install and use the application, so that the handheld device can render the display characters using the font files. Pursuant to Rule 11(b)(3), upon information and belief, the factual contentions – regarding the actions of Defendant Peak and DOES 1-5 -- will likely have additional evidentiary support after a reasonable opportunity for further investigation or discovery.

49. Defendant Dine Brands' Accused Product(s) provide that when the plurality of display characters are displayed, the plurality of display characters are displayed by a program module of the operating system using the one or more external font files. Upon information and belief,

13

when Defendants Peak and DOES 1-5 use the Accused Product(s), when the plurality of display characters are displayed, the plurality of display characters are displayed by a program module of the operating system using the one or more external font files.  In the Accused Product(s), when the display characters are displayed, they are displayed by a program module of the operating system using the one or more external font files in the .ipa.  Pursuant to Rule 11(b)(3), upon information and belief, the factual contentions – regarding the actions of Defendant Peak and DOES 1-5 -- will likely have additional evidentiary support after a reasonable opportunity for further investigation or discovery.

50. Defendant Dine Brands' Accused Product(s) provide that in response to the one or more external font files being installed, a system font table of the hand-held device is updated to reflect an availability of the external font files.  Upon information and belief, when Defendants Peak and DOES 1-5 use the Accused Product(s), in response to the one or more external font files being installed, a system font table of the hand-held device is updated to reflect an availability of the external font files.  After the application is installed and prior to rendering of the display characters, a system font table present in the operating system is updated to reflect that the external font files are available for use when executing the application. For example, in the iOS App, Defendant Dine Brands provides a font listing in the Info.plist file using the UIAppFonts key.   When the products are used, the iOS system loads the fonts specified by this key and makes them available for use by the iOS application.  Pursuant to Rule 11(b)(3), upon information and belief, the factual contentions – regarding the actions of Defendant Peak and DOES 1-5 -- will likely have additional evidentiary support after a reasonable opportunity for further investigation or discovery.

51. In addition to the elements identified above, the Accused Product(s) (and/or use of the

14

Accused Product(s)) include the elements of at least claims 6 and 11 of the '421 patent.

52. Pursuant to Rule 11(b)(3), the factual contentions regarding Defendant Dine Brands' Accused Products and the actions of Defendants Peak and DOES 1-5 are likely to have further evidentiary support after a reasonable opportunity for further investigation or discovery.

53. Each of Defendant Dine Brands and one or more of DOES 1-5 have had notice of their infringement of the '421 patent since at least April 2018.

54. Defendants Dine Brands, Peak, and DOES 1-5 have actively induced and continue to actively induce others to infringe the '421 patent.  Defendants Dine Brands, Peak, and DOES 1-5 advertisements and marketing materials, including but not limited to internet websites, advertisements, and Defendant Dine Brands' product listing(s) in online application stores accessible to the public encourage customers to infringe the '421 patent through use, sale, offers for sale, and/or importation of products and services incorporating the Accused Product(s).  As of the filing date of this complaint, Defendant Dine Brands' internet websites and advertisements have remained available and have continued to encourage customers to infringe the '421 patent. For example, the website at https://www.ihop.com/en encourages customers to use Defendant Dine Brands' Accused Product(s) in an infringing manner.  Upon information and belief, discovery will reveal the extent of involvement of DOES 1-5 in the actions identified in this paragraph.

55. Since the filing of the original Complaint, Defendants Peak and DOES 1-5 have continued to advertise and induce customers to infringe the '421 patent by installing and/or using the Accused Product(s) in an infringing manner.  For example, Defendants Peak and one or more of DOES 1-5, through Peak's restaurant located at 5277 S. State St., Murray, UT, has continued to induce customers to infringe by downloading and using the IHOP application as demonstrated

15

in the following photograph of a menu that was presented to customers in at least June 2019:



56. In the preceding photograph, the IHOP application is described as "our mobile app," demonstrating Defendant Peak's ownership or adoption of the IHOP application as its own.

57. As another example of inducing infringement by Defendants Peak and one or more of DOES 1-5, through Peak's restaurant located at 2487 S. 800 W., Woods Cross, UT, Peak and one or more of DOES 1-5 continued to induce customers to infringe by downloading and using the IHOP application, as demonstrated in the following photograph of a menu that was presented

16

to customers in at least June 2019:



58. Defendant Dine Brands has contributed to and continues to contribute to the infringement of the '421 patent. The identified products and services are especially made or especially adapted for use in practicing the patented inventions of the '421 patent in a manner that infringes the '421 patent, constitute a material part of the invention of the '421 patent, are not staple articles or commodities of commerce, and are not suitable for substantial non-infringing use.

59. All Defendants' infringement of the '421 patent has caused and continues to cause

17

damage to MFA in an amount to be determined at trial.

60. All Defendants' infringement as herein alleged will continue to cause immediate and irreparable harm to MFA for which there is no adequate remedy at law, unless this Court enjoins and restrains such activities.

61. All Defendants ignored MFA's notice of infringement in a reckless manner, as defined by *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 136 S. Ct. 1923, 1933 (2016) ("a person is reckless if he acts 'knowing or having reason to know of facts which would lead a reasonable man to realize' his actions are unreasonably risky."). Defendants Dine Brands and one or more of DOES 1-5 were informed of infringement by MFA. Defendants Dine Brands and one or more of DOES 1-5 were unwilling to enter into discussions with MFA. Defendant Peak has had constructive notice of the '421 patent since at least June 2018. Defendant Peak has had actual notice of its infringement of the '421 patent since at least April 2019. All Defendants' infringement of the '421 patent is willful. All Defendants have knowingly and willfully continued to make, use, offer for sale, sell and/or import products and services that infringe the '421 patent, contribute to such infringement, and/or induce such infringement by third parties.

62. All Defendants are liable to MFA for infringement of the '421 patent pursuant to 35 U.S.C. §271.

## **PRAYER FOR RELIEF**

WHEREFORE, MFA prays for the following relief:

1. That judgment be entered in favor of MFA that the accused Defendants infringed directly, infringed through inducement, and contributed to infringement and continue to infringe the '421 patent in violation of 35 U.S.C. §271;

2. That MFA be granted an accounting of all damages sustained because of Defendants' infringement of MFA's patent;

3. That MFA be awarded actual damages with prejudgment interest according to proof, and enhanced damages pursuant to 35 U.S.C. § 284 and as provided by law;

4. That a permanent injunction be issued pursuant to 35 U.S.C. §283 enjoining Defendants, their officers, agents, servants, employees and all other persons acting in concert or participation with them from further infringement of MFA's patent, or if a permanent injunction is denied, issuance of an ongoing royalty under 35 U.S.C. §283 or such other authority as may support such ongoing royalty;

5. That Defendants' infringement be deemed willful;

6. That this case be decreed an "exceptional case" within the meaning of 35 U.S.C. §285, and that reasonable attorneys' fees, expenses, and costs be awarded to MFA; and

7. That MFA be awarded such further relief as the Court deems just and proper.

## JURY DEMAND

MFA hereby demands a jury trial as to all issues triable to a jury.

Dated:  April __, 2020                    Respectfully submitted,

By:    */s/ Perry Clegg*
Perry Clegg (USB 7831)
pclegg@kba.law
KUNZLER, BEAN & ADAMSON, PC
50 W. Broadway, Suite 1000
Salt Lake City, UT 84101
Tel.: (801) 994-4646
Fax: (801) 531-1929

*Attorneys for Plaintiff,*
Modern Font Applications LLC